ROTHSCHILD, Judge.
 

 |2On November 23, 2004, a Petition for Declaratory Judgment and Damages for Breach was filed by Risk Management Services, L.L.C., (hereinafter “RMS”), Jean L. Robert and Dominick A. Vaccaro, Jr. against Robert W. Moss, III, a former member and manager of RMS, alleging breach of an operating agreement signed by Moss. Specifically, plaintiffs alleged that Moss was acting outside his role and authority as manager of RMS by forming a competing corporation and soliciting RMS customers and staff, and that these acts amounted to a breach of fiduciary duty and duty of loyalty to RMS. Plaintiffs sought a declaratory judgment that the operating agreement was valid and enforceable and on other matters regarding Moss’ relationship with RMS. Plaintiffs also sought monetary damages for injury to reputation and loss of business revenues caused by the breach of the operating agreement. Further, RMS alleged that Moss was in violation of the Louisiana Unfair Trade Practices Act.
 

 Moss responded with an answer and re-conventional demand which was amended several times alleging that Robert and Vaccaro breached the terms of the operating agreement as well as their fiduciary duties to the corporation. Moss sought
 
 *179
 
 damages as well as attorneys fees for the wrongful filing of the claims against him.
 

 This matter proceeded to trial on September 15, 2008. After several days of testimony, the trial court granted a declaratory judgment on October 1, 2008 in favor of RMS, Vaccaro and Robert, ruling among other things that the RMS operating agreement Rwas valid and binding, that the termination and expulsion of Moss were valid and that RMS remained in existence as a valid corporation. In addition, a jury rendered a verdict in favor of RMS, Vaccaro and Robert finding that Moss breached a duty of care and a duty of loyalty he owed to RMS as a manager and that this breach caused the loss of a contract by RMS. The jury awarded $7,563,360 to the plaintiffs for loss of the revenues expected to be generated by the contract. The jury also found that Moss engaged in unfair trade practices.
 

 The verdict was made judgment of the court on October 1, 2008, and the court awarded plaintiffs compensatory and special damages in the amount of $7,563,360 with legal interest and all costs of the proceedings. The court also rendered judgment in favor of plaintiffs and against Moss for attorneys fees provided by La. R.S. 51:1409A, the amount of which to be determined by the court at a future date. Finally, the court dismissed Moss’ recon-ventional demand, as amended, in its entirety with prejudice.
 

 In response to the final declaratory judgment, Moss filed a motion for new trial/motion to vacate or set aside the judgment. In response to the jury verdict, Moss filed a motion for new trial/motion to vacate/motion for judgment notwithstanding the verdict/ or alternatively motion for remittitur. These motions were denied by the trial court, and Moss now appeals from these rulings on the basis of several assignments of error.
 

 The testimony presented at trial indicates that Risk Management Services is a limited liability company formed in 1994 by members Jean Robert and Nick Vaccaro. RMS was engaged in the business of providing workers’ compensation administration services as a third party administrator. The duties of the members were set forth in an operating agreement which was introduced into evidence at trial. In 1998, Robert Moss was brought into the company as a member and manager, and the operating agreement was amended for this purpose on March 31, 1998, binding Moss to the provisions of the original agreement. This amended agreement is also contained in the record.
 

 One of the principal clients of RMS at this time was Louisiana United Business Self Insured Fund (LUBSIF), a group insurance fund started to provide workers’ compensation insurance benefits to members of the trade association, LUBA. RMS |4executed a three year contract with LUBSIF on July 1, 1997, and the service agreement was renewed on July 1, 2000 for a five year period, or until June 30, 2005. During this time period, RMS moved into work space with LUBSIF in Baton Rouge in order to achieve both parties’ objectives of seamless operations of both entities. Robert Moss was appointed as the RMS point person for the LUBSIF contract, and he moved to Baton Rouge to work in the joint offices.
 

 In October of 2001, RMS and LUBSIF agreed to retain a cost containment expert on the staff of RMS. This individual was Dr. James A. Poche, a neurosurgeon, who was assigned the task of evaluating the fee bills sent to LUBSIF to reduce waste or overcharging. In July of 2003, Robert Moss, Dr. James Poche and Ronald Francis formed a company, Cost Containment Services (CCS), to assist RMS in controlling insurance costs.
 

 
 *180
 
 Initially, RMS worked with CCS to provide services to LUBSIF and RMS’ other major client, Louisiana Automobile Dealers Association (LADA). However, the record indicates that in October 2003, the LUBA administrator responsible for LUB-SIF, David Bondy, became unsatisfied with Dr. Poche after he proposed a contingency arrangement rather than a flat-fee basis for computing his compensation. After meeting with the principals of LUBSIF including Mr. Bondy, RMS asked Dr. Poche to move to other office space. The following day, Moss, Francis and Poche left the RMS offices, although Moss remained a member of RMS.
 

 Based on these actions, LUBSIF instructed RMS to restrict its confidential financial information from access by former employees. However, RMS subsequently learned that Robert Moss copied LUBSIF information from its computer systems. RMS then attempted to secure confidentiality of the LUBSIF information by preparing a written agreement between RMS and CCS, but CCS refused to sign the document. The document was eventually signed by two of the CCS members in June of 2004.
 

 In May of 2004, LUBA informed RMS that it would not renew its contract after the June 30, 2005 term. At this point, the relationship between the members of RMS continued to deteriorate. In September of 2004, CCS applied for a license as a Third Party Administrator for workers’ compensation self-insured funds. By this action, Robert [,-,and Vacearo believed that CCS was attempting to take current business from RMS. On November 1, 2004, Robert and Yaccaro called a meeting of RMS members to remove Moss as a manager. Moss attended this meeting, but departed before the remaining members voted to remove him as a manager of RMS. On December 2, 2004, a second meeting was called wherein Robert and Vaccaro voted to expel Moss from his membership in RMS. Although Moss was notified of this meeting, he failed to attend. On March 2, 2005, the vote to expel Moss was ratified.
 

 By its first assignment of error, Moss contends that the trial court erred in determining that the expulsion of Moss as a member was valid under the operating agreement or under Louisiana law. The statutory provisions governing limited liability companies are contained in La. R.S. 12:1301, et seq. Although appellant agrees that nothing in these statutory provisions prevent the expulsion of a member, appellant argues that the operating agreement in this case fails to contain an affirmative grant of power to expel a member, and requires unanimous consent of all members to dissolve the company upon the expulsion of a member. We disagree.
 

 An operating agreement is contractual in nature; thus, it binds the members of the LLC as written and is interpreted pursuant to contract law.
 
 Kinkle v. R.D.C., L.L.C,
 
 04-1092 (La.App. 3 Cir. 12/8/04), 889 So.2d 405, 409. In
 
 Henderson v. Sellers,
 
 01-529, pp. 4-5 (La.App. 3 Cir. 12/5/01), 815 So.2d 853, 856, the Third Circuit explained the law pertaining to contractual interpretation:
 

 The interpretive purpose is to determine the common intent of the parties. La.Civ.Code art.2045. In attempting to determine that common intent, we may not seek a different interpretation “when the words of a contract are clear and explicit and lead to no absurd consequences.” La.Civ.Code art.2046. However, if words of a contract are susceptible of different meanings, we must interpret them in the manner that “best conforms to the object of the contract.” La.Civ.Code art.2048. We are required to interpret a doubtful provision “in light of the nature of the contract, equi
 
 *181
 
 ty, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.” La. Civ. Code art.2053. Additionally, where the doubt created by a contract provision cannot be removed, we must interpret that provision against the party who furnished it. La.Civ.Code art.2056.
 

 The determination of whether the words of a contract are clear and explicit or ambiguous is a question of law. Thus, an appellate court’s determination on review is | fiwhether the trial court interpreted the contract correctly or incorrectly.
 
 Hebert v. Ins. Ctr., Inc.,
 
 97-298 (La.App. 3 Cir. 1/7/98), 706 So.2d 1007, 1011,
 
 writ denied,
 
 98-0353 (La.3/27/98), 716 So.2d 888. La. C.C. art.1983.
 

 Following trial in this matter, the trial court found that the expulsion of Robert Moss as a member of the LLC was valid and binding. The court specifically held that unanimous consent of all members is not required to expel one of the members, but that all members must be notified of the occurrence of a vote on expulsion.
 

 Our review of the operating agreements, both the original agreement and as amended, fails to reveal that the trial court’s interpretation of the agreements was erroneous. Article VI of the original operating agreement pertains to dissolution, and provides as follows:
 

 Section 6.1 — Date of Dissolution
 

 The Limited Liability Company will be dissolved and its affairs will be wound up upon the first to occur of the following:
 

 1. The date of dissolution set forth in the Articles of Organization;
 

 2. The consent of its members as set forth in section 1.8 of Article I;
 

 3. The death, interdiction, withdrawal, expulsion, bankruptcy or dissolution of a member, or the occurrence of any other event which terminates the continued membership of a member in the Limited Liability Company, unless, within ninety (90) days after such event, the Limited Liability Company is continued by the unanimous written consent of the remaining members and, if membership is reduced to one, the admission of one or more members; or
 

 4.The entry of a decree of judicial dissolution pursuant to La. R.S. 12:1335.
 

 Section 6.1(3) was amended as follows in the First Amendment to Operating Agreement:
 

 14. Amendment to Section 6.1(3) of the Agreement. Section 6.1(3) of the Agreement is amended to read as follows:
 

 3. The bankruptcy, withdrawal (voluntarily or involuntarily), expulsion, interdiction judicial declaration of incompetency, dissolution, total and permanent disability or death of a member, or the occurrence of any other event which terminates the continued membership of a member in the Limited Liability Company, unless, within ninety (90) days after such event, the Limited Liability Company is continued by the unanimous written consent of the remaining members and, if membership is reduced to one, the admission of one or more members; (Emphasis added).
 

 Thus, section 6.1(2) of the original agreement requires unanimous consent of all members for dissolution of the company. However, section 6.1(3) provides for the termination of continued membership of one of the members of the company on several |7grounds, in this case, by expul
 
 *182
 
 sion. These acts only result in dissolution under specified circumstances and this provision of the agreement does not require unanimous consent of the members. Although the agreement does not contain a detailed procedure for expulsion of a member, it nevertheless clearly provides for the act of expulsion. Both parties rely on La. C.C. art.2054 which relates to a situation when the parties make no provision for a particular event
 
 [1]
 
 ; however, the operating agreement in this case contains a provision relating to expulsion. Further, we find that the equity considerations as defined in La. C.C. art.2055 would require that a provision for expulsion of a member be included in this type of agreement.
 
 [2]
 
 We therefore find no error in the trial court’s determination that Robert Moss was properly expelled as a member of the LLC pursuant to the terms of the operating agreement.
 

 Moss next contends that the jury verdict finding that he breached his fiduciary duty to the LLC and to its members was manifestly erroneous. We do not agree.
 

 La. R.S. 12:1320 specifies that the liability of members, managers, employees or agents of a limited liability corporation (“LLC”) is determined solely and exclusively under the provisions of Louisiana LLC law. A member or manager of an LLC company shall be deemed to stand in a fiduciary relationship to the company and its members and shall discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances. La. R.S. 12:1314(A)(1). In determining whether a member of an LLC has breached a fiduciary duty to the LLC and its members, at minimum, a gross negligence standard and the business judgment rule is employed. La. R.S. 12:1314(B). Gross negligence is defined as “a reckless disregard of or a carelessness amounting to indifference to the best interests of the limited liability company or the members thereof.” La. R.S. 12:1314(C).
 

 Moss contends that none of the actions complained of by plaintiffs rise to a breach of fiduciary duty owed to the LLC or its members or demonstrated that Moss was grossly |snegligent. Further, Moss argues the evidence presented fails to show he breached any trust to the LLC or acted outside the limits of his authority. Specifically, Moss contends that Robert and Vac-caro knew that Moss created CCS, and in fact, were equity partners in that company, and further, Moss did not neglect his duties to RMS to solicit business for CCS.
 

 A reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and
 
 *183
 
 appellate functions between the respective courts.
 
 Canter v. Koehring Co.,
 
 283 So.2d 716, 724 (La.1978);
 
 Ambrose v. New Orleans Police Department Ambulance Service,
 
 93-3099 (La.7/5/94), 639 So.2d 216, 221.
 

 The jury verdict form provided as follows:
 

 1. Do you find by a preponderance of the evidence that Defendant Robert Moss was grossly negligent in failing to exercise care as a manager of Risk Management Services or that he did so intentionally?
 

 2. Do you find by a preponderance of the evidence that Defendant Robert W. Moss’s breach of the duty of care he owed as a manager of Risk Management Services was a cause in fact of the loss of the LUBSIF contract?
 

 3. Do you find by a preponderance of the evidence that Defendant Robert Moss breached the duty of loyalty he owed as a manager of Risk Management Services?
 

 4. Do you find by a preponderance of the evidence that the Defendant Robert W. Moss’s breach of the duty of loyalty he owed as a manager of Risk Management Services was a cause in fact of the loss of the LUB-SIF contract?
 

 The jury unanimously responded ‘Tes” to each of these interrogatories and accordingly awarded damages to plaintiffs for the loss of the contract.
 
 [3]
 

 Our review of the record in this case reveals a reasonable factual basis for the jury’s factual determinations that Moss breached his fiduciary duties to plaintiffs. The administrator of LUBSIF, David Bon-dy, testified that at some point in 2002 Moss’ | aattention to the fund began to drift, and in 2003 he met with Robert and Vacca-ro to discuss the situation and to express his dissatisfaction with the level of service provided by RMS. Specifically, Bondy was concerned about the compensation structure presented by Dr. Poche who was connected with Moss in CCS. In addition, both Bondy and Clyde Roy, the LUBA CEO, were concerned that Moss concentrated more on developing CCS than on overseeing the LUBSIF account in his role as a manager of RMS. Although RMS subsequently removed Dr. Poche from the RMS offices at the request of Bondy, Bondy testified that he feared the relationship with RMS might not be salvageable. RMS was informed in May of 2004 that the LUBSIF contract would not be renewed after its June 2005 expiration. Bondy, Roy and Chip Marrionneaux, the chairman of the board of LUBSIF, each testified that LUBSIF would have more than likely renewed its contract with RMS but for the damage Moss caused to the relationship and the disruption and lack of trust he engendered.
 

 Thus, the evidence at trial supports a finding that Moss’ actions and breach of fiduciary duties to RMS caused the loss of the LUBSIF contract. In addition, the evidence reveals that Moss was attempting to use CCS to compete with RMS. The record contains testimony of employees of RMS, Glenda Castro and Randy Hava, regarding telephone conversations with Moss in October of 2004 while he was still a manager and member of RMS. According to Ms. Castro, who documented the conversations in a written document admitted into evidence, Moss told her he heard that LUBSIF was no longer a client of RMS and that Moss was planning to take the LADA account from RMS as well.
 

 
 *184
 
 In addition, the record contains testimony that Moss promised to retain high-level employees of RMS in his third party administration business. Moss also refused to sign a confidentiality agreement for several months, from January of 2004 when he left the RMS offices until June of 2004. Prior to this time, Moss also took information from computer files that were in his possession based on his relationship with RMS.
 

 The record also contains information that Ronnie Francis, who previously handled the claims of LADASIF on behalf of RMS, began working with Moss to contact LADASIF to point out deficiencies in claims handling by RMS staff. LADASIF was |10RMS’ second largest client behind LUBSIF. In September of 2004, the administrator of LADASIF called a meeting with Robert and Vaccaro of RMS to discuss these allegations, and although Moss was present at the meeting and still a member of RMS, he aligned himself with Francis. The allegations made against RMS were never supported with proof, and the administrator took no action against RMS.
 

 Our review of the record reveals a reasonable factual basis for the jury’s determination that Moss breached his fiduciary duties to RMS. We find that the record supports a finding that Moss’ actions amounted to a reckless disregard of the best interests of RMS, Robert and Vacca-ro. We find no basis to disturb the jury’s award.
 

 The jury also made a factual determination that Robert Moss engaged in an unfair trade practices. Moss contends that the jury finding is manifestly erroneous because Moss never competed with RMS. Moss argues that the operating agreement did not prevent members from pursuing other business ventures or from forming a company that would compete with RMS.
 

 The Unfair Trade Practices and Consumer Protection Law as codified in La.R.S. 51:1405 declares that “[ujnfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce” are unlawful. La. R.S. 51:1409 provides that “any person who suffers any ascertainable loss of money or movable property, corporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405” has a cause of action under the statute for damages. A right of action exists under LUTPA only for consumers or business competitors.
 
 Vermilion Hosp. Inc. v. Patout,
 
 05-82 (La.App. 3 Cir. 6/8/05), 906 So.2d 688.
 

 What constitutes unfair competition is a matter to be decided in each individual case. Damages will be awarded under the statute only when the plaintiff proves some element of fraud, misrepresentation, deception, or other unethical conduct on the part of the defendants. The key consideration is business honesty.
 
 National Oil Service of Louisiana, Inc. v. Brown,
 
 381 So.2d 1269, 1273-74 (La.App. 4th Cir.1980).
 

 The statutory definition of an “unfair” practice is broad and subjectively stated and does not specify particular violations.
 
 Jarrell v. Carter,
 
 577 So.2d 120, 123 (La.App. 1st |nCir.1991),
 
 writ denied,
 
 582 So.2d 1311 (La.1991). A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious.
 
 Jarrell v. Carter,
 
 577 So.2d at 123. What constitutes an unfair trade practice is to be determined on a case-by-case basis.
 
 Monroe Medical Clinic, Inc. v.
 
 
 *185
 

 Hospital Corp. of America,
 
 522 So.2d 1362, 1365 (La.App. 2nd Cir.1988).
 

 A trade practice is “deceptive” for purposes of LUTPA when it amounts to fraud, deceit or misrepresentation.
 
 United Group of Nat. Paper Distributors, Inc. v. Vinson,
 
 27,739 (La.App. 2 Cir. 1/25/96), 666 So.2d 1338, 1346,
 
 writ denied,
 
 96-0714 (La.9/27/96), 679 So.2d 1358.
 

 In the present ease, David Bondy, the administrator of LUBSIF, testified that in 2002, Moss’ commitment to the LUBSIF account seemed to have waned. His attempts to speak to Moss about the situation were unsuccessful, and Bondy began to take a more active role in the management of the fund. Mr. Bondy stated he “began to become more concerned when it became clear that there was a business enterprise that seemed to be growing with regard to Doctor Jim Poche and Ronnie Francis.” He expressed dissatisfaction and discomfort with the “budding of CCS company that just — that was being created right there in our offices, under a whole different method of operation than we had been used to.” Bondy was also concerned that Moss had access to LUBSIF data after he left the RMS offices.
 

 The record also contains the testimony of Glenda Castro, an RMS employee, who stated that Moss told her in an October 2004 telephone conversation that he intended to take clients and staff from RMS. In addition, Randy Hava, an RMS employee testified that he went to a meeting called by Moss in 2004 wherein Moss discussed taking the LUBSIF business from RMS. Hava also stated he spoke by phone to Moss in October of 2004 when Moss stated that if he was able to get some new business with CCS, that Hava and Glenda Castro would be able to work with them. Moss told Hava that he was working on getting an administrator’s license and that he “felt pretty sure he could get the LADA business that RMS had.”
 

 The record in this is clear that Moss, along with two other individuals, initially formed an LLC referred to as CCS for the purpose of assisting RMS in servicing its | ^contracts. However, at some point but while Moss was still a member of RMS, CCS took on the objective of becoming a licensed third party administrator. To this end, Moss attempted to secure RMS’ clients for CCS, and also attempted to secure RMS employees for his new enterprise. We find that the trial court correctly found that these actions amounted to unfair trade practices which are prohibited by La. R.S. 51:1405. The record further indicates that Moss’ improper actions were largely responsible for the loss of the LUBSIF contract by RMS. We have thoroughly reviewed the testimony and evidence presented at trial, and we find no manifest error in the jury’s determination that Moss engaged in unfair trade practices.
 

 Accordingly, for the reasons assigned herein, the judgment of the trial court and verdict of the jury are hereby affirmed. Appellant shall bear all costs of this appeal.
 

 AFFIRMED.
 

 [1]
 

 . La. C.C. art.2054 provides: “When the par-lies made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose”.
 

 [2]
 

 . La. C.C.art.2055 provides in part: “Equity, as intended in the preceeding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.”
 

 [3]
 

 . Moss does not assign as error the amount of the judgment rendered against him by the jury, and that issue is therefore not before us on appeal.