JOHNSON, C.J.*
hBy virtue of a series of assignments, Clovelly Oil Co., LLC (“Clovelly”) and Midstates Petroleum Co., LLC (“Mid-states”) are now parties to a 1972 joint operating agreement (“JOA”). We granted this writ application to determine whether a lease acquired by Midstates in *190 2008 is subject to the provisions of the JOA.[1] Answering that question in the negative, we reverse the ruling of the court of appeal and reinstate the ruling of the trial court.
FACTS AND PROCEDURAL HISTORY
A JOA is a contractual agreement between interested parties for the operation of a tract or leasehold for oil, gas and other minerals.[2] This matter arises out of a JOA entered into in 1972 by Robin F. Scully, as Operator, and Fred Goodstein along with McLain J. Forman, as Non-Operators. Clovelly and Midstates became parties to the JOA through separate chains of assignments. Clovelly is the successor in interest to |2the operator designated in the JOA and the former operator’s 56.25% working interest as provided in the JOA and subsequent acquisitions. Midstates is the successor in interest to a non-operating, undivided 48.75% working interest as provided in the JOA.
Parties to a JOA typically use one of several “model” forms developed by the American Association of Professional Landmen (“AAPL”).[3] The JOA used in this case is “AAPL Form 610-Model Form Operating Agreement” adopted by the AAPL in 1956. The relevant portions of the JOA provide as follows:
OPERATING AGREEMENT
DATED
July 16,1972
FOR UNIT AREA IN TOWNSHIPS 3 & 4 South, RANGE 1 West,
Evangeline Parish, STATE OF Louisiana
The Preamble to the JOA provides:
WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit “A”, and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided:
Section 1 of the JOA contains the following relevant definitions:
(4) The term “oil and gas interests” shall mean unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by the parties to this agreement.
(5) The term “Unit Area” shall' refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit “A.”
| ^Exhibit “A” contains typewritten terms made by the original parties to the JOA. Section I of Exhibit A is titled “Lands *191 subject to this agreement” and reads “The following described property situated in Evangeline Parish, Louisiana,” and lists certain geographic parameters.[4]
Section 23 of the JOA addresses renewal or extension of leases, and provides in relevant part that “[a]ny renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.”
On July 1, 2008, Midstates secured a new oil and gas lease from Crowell Land & Mineral Corporation that covers 242.28 acres situated in a geographic area described in Exhibit “A.” In April of 2009, Midstates re-entered an abandoned Cro-well Land & Mineral Corporation well and prepared the location for work on other abandoned wells situated on the Crowell leased lands.
On April 22, 2009, Clovelly notified Mid-states that Midstates’ leasing activities and operations were covered and affected by the JOA. Clovelly claimed a 56.25% working interest in the new lease and the right to operate that lease. Clovelly filed a Petition for Breach of Contract and Declaratory Judgment, seeking judgments declaring the respective rights and obligations of Clovelly and Midstates under the terms and conditions of the JOA; requiring Midstates to comply with the terms and | conditions of the JOA; and for damages for Midstates’ breach of contract.
Clovelly and Midstates filed motions for partial summary judgment on the issue of whether the JOA applies to the new lease. The trial court granted partial summary judgment in favor of Midstates, declaring that the JOA does not apply to the new lease. In granting Midstates’ motion for summary judgment, the trial court held the JOA executed in 1972 did not apply to new leases obtained by Midstates thirty-five years after the agreement was executed. The court stated:
A cursory reading of the Joint Operating Agreement seems clear to this Court that the parties contemplated the present and not the future when they entered into this agreement. Surely they did not intend for one party to stand idle and wait for the other party to drill and explore. Taken to ridiculous ends we could find one party doing nothing and waiting for the other party to take the risks and bear the loss of dry holes and then simply show up at successful wells and announce their intention to participate and pay.
Clovelly appealed. The court of appeal reversed, finding that any lease obtained within the geographic area delineated in Exhibit “A” is subject to the JOA. Specifically, the court held that any “unleased fee and mineral interests” in tracts of land located within the Unit Area, as delineated on Exhibit “A” to the JOA, were “intended to be developed and operated” by the original parties to the JOA.[5] Midstates filed a writ application with this court, which we *192 granted.[6]
DISCUSSION
This court applies a de novo standard of review in considering the lower courts’ rulings on parties’ summary judgment motions.[7] Thus, we use the same criteria that govern the trial court’s consideration of whether summary judgment is | 5 appropriate.[8] A court must grant a motion for summary judgment “[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.”[9]
In this case we are charged with determining whether the JOA governs future leases. To do so, we must apply general principles of contract interpretation. “Contracts have the effect of law for the parties” and the “[interpretation of a contract is the determination of the common intent of the parties.”[10] The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed.[11] “When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.”[12] Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract.[13] “Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties.” [14] However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences.[15] Most importantly, a | r,contract “must be interpreted in a common-sense fashion, according to the words of the contract them common and usual significance.” [16] Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective.[17] Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.[18]
Midstates argues that, based on Louisiana principles of contract construc *193 tion, the model form JOA at issue does not cover future leases. We agree. Applying these bedrock principles of statutory construction, we find the court of appeal erred in its interpretation of the JOA. We interpret the JOA to apply to leases and un-leased mineral interests located within the geographic area described in Exhibit “A,” which were owned by the parties at the time the JOA was executed.
The court of appeal’s ruling disregards the present tense language of the Preamble, as well as the present tense language of Section 1(4). The Preamble refers to leases and unleased mineral interests of which the parties “are owners ” in the tracts of land described in Exhibit “A,” and states that the parties agree “to explore and develop these leases and interests.” Section 1(4) defines “oil and gas interests” as “unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by the parties.” A straightforward reading of this language makes clear that the parties will jointly explore and develop the leases and unleased mineral interests, located in lands described in Exhibit “A,” owned by the parties when they signed the JOA.
The court of appeal found a conflict existed between the language contained pin the model form JOA and that added by the parties in Exhibit “A.” The court found that Exhibit “A,” in which the parties detailed a particular geographic area, set forth “all of the lands” intended to be developed under the JOA without any mention of specific leases or any language limiting its description to presently-owned leases. In so ruling, the court relied on a Kansas Supreme Court case, Amoco Production Co. v. Charles B. Wilson, Jr., Inc.[19] According to the court of appeal, the Kansas court rejected Amoco’s argument that the use of the present tense “are” in the “Whereas” clause (Preamble) limited the agreement to leases that were in effect at the time the JOA was executed. In rejecting the argument, the Kansas court applied the rule of contract interpretation that typewritten language added to a form contract by the parties controls or is determinative of the parties’ intent on the issue addressed in the typewritten language and concluded that the typewritten Exhibit A prevailed because the parties specifically agreed as to what their agreement covered.[20] Finding Louisiana jurisprudence to be the same, the court of appeal agreed with the Amoco court’s conclusions and applied that rule of contract interpretation to find that Exhibit “A” governs the claims between Clovelly and Midstates because it was prepared by the parties to the JOA and, therefore, reflects their intent as to what interests the JOA encompasses.[21] We find the court of appeal misapplied the rule and erred in its reliance on Amoco.
Generally, when the printed contract provisions irreconcilably conflict with the provisions added by the parties, the added provisions will control.[22] This rule necessarily follows from the fundamental principle that the primary goal of contract | ^interpretation is to ascertain the intent of the parties. Since the parties actually chose to add to or modify the printed contract, the written terms presumably better reflect their intention than those contained in a printed contract intended for general use.[23] But, even where *194 a contract contains both printed and handwritten or typewritten terms, the contract must still be interpreted as a whole, and the printed terms should be interpreted, if possible, so as to give them effect and to harmonize them with the provisions that are handwritten or typewritten.[24] Here, we find no express conflict between the printed and typewritten terms of the JOA. There is no language in Exhibit “A” concerning future leases, nor is there language expressly contradicting the present tense language in the Preamble and Section 1(4). Moreover, it is possible to read the language of the printed and typewritten terms in harmony to avoid a conflict by reading the present tense language of the printed terms to limit Exhibit “A” to leases owned by the parties at the time the JOA was executed. Under this reading, the printed terms expressly limit the JOA to presently-owned leases, and the description in Exhibit “A” is the geographic area in which the parties hold leasehold interests. This construction of the JOA is reasonable and gives effect to all of its terms.
Additionally, we find no guidance in Amoco. Decisions of courts of other jurisdictions are not controlling on this court, and may only be persuasive.[25] However, we find Amoco distinguishable from the instant case and thus irrelevant. In that case, Amoco and Wilson entered into a joint venture to explore for and develop all oil and gas rights below a particular geologic formation (Hugoton) in a specified area. 19Specifically, Exhibit A defined the Unit Area geographically as “All rights below the base of the Hugo-ton.” Although Wilson held a lease over the south half of the area, in preparing the agreement setting forth the Unit Area, Amoco knowingly misrepresented that it held a lease over all of the north half of the area, when it actually only held rights above 3,400 feet. Amoco later obtained a lease covering depths below 3,400 feet, and argued that the lease was not covered by the agreement because the Unit Area only encompassed those leases owned by the parties at the time the JOA was executed. The court disagreed, finding the language in Exhibit A controlling because it subjected the JOA to being performed as the parties originally intended. Further, the Kansas court stated that it was not holding that all after-acquired leases were covered by the JOA. The court was also influenced by the fiduciary duties imposed on parties in a joint venture, noting they “stand in a close relationship of trust and confidence and have the right to demand and expect from the other full, fair, open and honest discourse of everything affecting the relationship. To construe the agreement as Amoco asks would fly in the face of these directions.”[26]
We find the Amoco decision was fact specific and based on the clear intention of the parties as to what land was covered by the JOA. Based on the facts of that case, the court found it was the clear intent of the parties to include all of the land described in Exhibit A. The decision was also influenced by Kansas law, which imposes a fiduciary duties on parties to the JOA. In Louisiana, no such duties are imposed because the JOA does not create a partnership unless the contract' expressly *195 so provides.[27]
The court of appeal’s interpretation of the JOA also renders Section 23 of the JOA virtually without effect. Pursuant to Section 28, a renewal or extension lease is |innot subject to the JOA unless all the parties to the JOA elect to participate. A cardinal rule of contract construction is that a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.[28] We have recognized that this rule should be applied to interpret contract provisions “so as to avoid neutralizing or ignoring any of them or treating them as surplusage.”[29] If all future leases in the geographic area set forth in Exhibit “A” are automatically subject to the JOA, the language of Section 23, allowing the parties to choose whether to participate in renewal or extension leases, is essentially rendered meaningless. At the very least, the court of appeal’s interpretation is incongruous and leads to the absurd result that the parties to the JOA would have the option to decide whether to participate in renewal or extension leases, which are more familiar to the parties, but new future leases, with less familiarity, would automatically be subject to the JOA.
Furthermore, applying the court of appeal’s interpretation of the JOA defies common sense and leads to absurd results because the JOA would automatically apply to new leases without providing sufficient procedural safeguards. Under the provisions of the JOA, the parties are required to share in certain costs for leases covered by the JOA. Thus, under the court of appeal’s holding; parties to the JOA would incur costs for leases even though the parties were not permitted to elect whether those leases should be subject to the JOA. And, while the JOA does allow a party to refuse to consent to certain costs, it does not protect the non-consenting party from exposure to every cost the parties must share for leases covered by the JOA.
Notably, the parties could have expressly agreed that the JOA would apply to | nfuture leases by including an Area of Mutual Interest provision (“AMI”). An AMI provision is defined as an agreement between or among parties to a joint operating agreement by which the parties attempt to describe a geographical area within which they agree to share certain additional leases or other interests acquired by any of them in the future.[30] The purpose of the AMI clause is to ensure every party to the operating agreement an opportunity to acquire a proportionate interest in any acquisitions within a specified area encompassing the contract area, regardless of the state of development of the newly acquired acreage.[31] The AMI clause assures participants that the developmental opportunities in the area will be owned by them in the same percentages as the initial risk dollars are borne, preventing one of the participants from using the jointly acquired data to acquire leases in the AMI for its sole account. The AMI clause also limits competition in the acquisition of leases in the area.[32] Commenta *196 tors have recognized that, with the limited exception of the extension and renewal clause, the AAPL model forms do not contain an AMI provision, and new leases taken within the contract area are not covered by the operating agreement unless they are renewal or replacement leases.[33] While not contained in the body of any of the AAPL Joint Operating Agreement Forms, an AMI provision is often added by the parties to the JOA.[34] The AAPL, promulgator of the Model Form, has also expressed that although the Model Form JOA is designed to accommodate specially negotiated conditions, such as an AMI provision, AMI provisions are not, and have never been, included as a standard provision in the | üiModel JOA.[35]
AMI clauses generally provide the non-acquiring parties with information regarding the acquisition, including price, conditions, and related terms. The non-acquiring parties will typically be allowed a specified period of time to determine if they desire to participate on the same basis.[36] The court of appeal’s ruling does not address these crucial issues. Further, an AMI provision gives the parties to the JOA an option as to whether they wish to share in a future lease, but under the court of appeal’s opinion, all future leases within the geographical area delineated in Exhibit “A” would automatically be subject to the JOA, depriving the parties of any option. Therefore, the JOA parties would have no reasonable way to manage or predict the risks they might incur after they enter into a JOA with another party.
A court is not authorized to alter or make new contracts for the parties. A court’s role is only to interpret the contract.[37] The result of the court of appeal’s interpretation was to judicially insert into the JOA an AMI provision, but without providing any of the necessary information for its application.
CONCLUSION
The language of the JOA, properly interpreted, compels us to conclude that the JOA does not apply to the new lease acquired by Midstates. We hold that the JOA applies to leases and unleased mineral interests located within the geographic area described in Exhibit “A,” which were owned by the parties at the time the JOA was executed.
11SDECREE
REVERSED. THE RULING OF THE TRIAL COURT IS HEREBY REINSTATED.
Judge JEFFERSON D. HUGHES III was assigned as Justice pro tempore sitting for KIMBALL, C.J. for oral argument, and sits as an elected Justice at the time this opinion is rendered.

 Judge Jefferson D. Hughes III was assigned as Justice pro tempore sitting for Kimball, CJ. for oral argument, and sits as an elected Justice at the time this opinion is rendered.

. Because we reverse the ruling of the court of appeal and reinstate the ruling of the trial court, we pretermit discussion of Midstates' second assignment of error.

. 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers: Manual of Oil and Gas Terms, 527-30 (2012).

. Established in 1956, the AAPL is a "professional organization that unites approximately 17,000 landmen and land-related persons through professional development and service. AAPL serves as the voice of the land-man profession and continually seeks to foster industry cooperation through proactive legislative advocacy.” America’s Landmen, http:// www.landman.org/about~aapl (last visited Feb. 20, 2013).

. Township 3 South, Range 1 West
Section 23 — S ½
Section 25 — All fractional
Section 26 — All fractional
Section 27 — All fractional
Section 28 — E ½
Section 34 — Fractional E ½
Section 35 — All
Section 36 — All
Section 37 — All
Township 4 South, Range 1-West
Section 1 — All
Section 2 — All
Section 3 — All
All as is more fully shown in red on the plat marked "Attachment I” annexed hereto.

. Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 12-142 (La.App. 3 Cir. 6/6/12), 95 So.3d 1168.

. Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 12-2055 (La.12/14/12), 104 So.3d 426.

. Property Insurance Association of Louisiana v. Theriot, 09-1152 (La.3/16/10), 31 So.3d 1012, 1014.

. Greemon v. City of Bossier City, 10-2828 (La.7/1/11), 65 So.3d 1263, 1267.

. La. C.C.P. art. 966(B).

. Marin v. Exxon Mobil Corp., 09-2368 (La. 10/19/10), 48 So.3d 234, 258; La. C.C. arts. 1983 and 2045.

. Prejean v. Guillory, 10-0740 (La.7/2/10), 38 So.3d 274, 279.

. La. C.C. art. 2046.

. Prejean, 38 So.3d at 279.

. Id.

. Amend v. McCabe, 95-0316 (La.12/1/95), 664 So.2d 1183, 1187; La. C.C. art. 2046.

. Prejean, 38 So.3d at 279.

. Amend, 664 So.2d at 1187; La. C.C. art. 2049.

. La. C.C. art. 2050; Amend, 664 So.2d at 1187.

. 266 Kan. 1084, 976 P.2d 941 (1999).

. Id. at 954.

. Clovelly, 95 So.3d at 1174.

. See Kuhn v. Planche Real Estate Co., 249 La. 85, 185 So.2d 210 (1966).

. See 11 Williston on Contracts § 32:13 (4th ed.); Restatement (Second) of Contracts § 203 (1981).

. 5 Margaret N. Kniffin, Corbin on Contracts § 24.24, at 262 (1998); La. C.C. art. 2050.

. Frey v. Amoco Production Co., 603 So.2d 166, 182 (La.1992); Pelican State Associates, Inc. v. Winder, 253 La. 697, 219 So.2d 500 (La.1969); Webb v. Zurich Ins. Co., 251 La. 558, 205 So.2d 398 (La.1967).

. Amoco, 976 P.2d at 955.

. See La. R.S. 31:215.

. La. C.C. art. 2050.

. John Bailey Contractor, Inc. v. State, DOTD, 439 So.2d 1055, 1058 (La.1983) (internal citations removed)(italics in original).

. Martin & Kramer, supra n. 2, at 54-55.

. Id.

. See Terry I. Cross, The Ties that Bind: Preemptive Rights and Restraints on Alienation that Commonly Burden Oil and Gas Properties, 5 Tex. Wesleyan L.Rev. 193, 215 (1999).

. See Gary B. Conine, Property Provisions of the Operating Agreement-Interpretation, Validity, and Enforceability, 19 Tex. Tech L.Rev. 1263, 1345 (1988); Cross, supra n. 32, at 216.

. Martin & Kramer, supra n. 2, at 54 — 55.

. The AAPL filed an amicus brief in this matter supporting Midstates.

. See D. Zarlengo, Area of Mutual Interest Clauses Regarding Oil and Gas Properties: Analysis, Drafting, and Procedure, 28 Rocky Mtn. Min. L. Inst. 837, 859-60 (1983).

. Burmaster v. Plaquemines Parish Government, 10-1543 (La.App. 4 Cir. 3/30/11), 64 So.3d 312, 317; Bown v. Austral Oil Co., Inc., 322 So.2d 866, 870 (La.App. 3 Cir.1975), writ denied, 326 So.2d 370 (La.1976); Kniffin, supra n. 24, at § 24.19.