STEWART J. '
liln this matter concerning a noncom-pete and nonsolicitation provision in an operating agreement, both parties appeal the trial court’s judgment granting in part and denying in part a preliminary injunction sought by the plaintiff, Powertrain of Shreveport, L.L.C. (“Powertrain”), against its former member and the defendant, Denzil Stephenson (“Stephenson”). From our review of this record, we find that the operating agreement does not contain an executed noncompetition and nonsolicitation agreement and that it does not require execution of such an agreement under the plain wording of the agreement and the facts of this case. Therefore, we reverse that part of the trial court’s judgment granting the preliminary injunction, affirm that part denying injunctive relief, and dismiss the claims of Powertrain against Stephenson.
FACTS
On April 29, 2013, Powertrain filed suit in the Fourth Judicial District Court, Oua-chita Parish, against Stephenson for assignment of his 10 percent interest in Powertrain back to the company, for a declaratory judgment that he is bound by a noncompetition and nonsolicitation provision in Powertrain’s operating agreement,[1] and for an order precluding Stephenson from being employed by or affiliated with any Powertrain competitor and from soliciting any Powertrain clients. In answer, Stephenson asserted that he offered to assign his interest back to Powertrain’s owner, Joe Niswanger |2(“Joe”), but that he refused to sign any noncompetition and nonsolicitation agreement.
By a judgment rendered August 14, 2013, on a exception of improper venue, the matter was transferred to the First Judicial District Court, Caddo Parish, where it was heard on October 23, 2013.
At the start of trial, the parties agreed to a number of stipulations. First, Stephenson was formerly employed by Pow- *1277 ertrain under a guaranteed payment arrangement. Second, he was no longer employed by Powertrain or receiving such payment. Third, Stephenson had become and was then a member of Louisiana Industrial Diesel, LLC (“Industrial”), which was formed two days prior to Stephenson’s departure from Powertrain. Records from the Louisiana Secretary of State’s website show that Industrial was registered on February IB, 2013, and that Stephenson was listed as a member. Fourth, Industrial repairs and services commercial and industrial vehicles, and Powertrain conducted the same business during the time of Stephenson’s employment with it. Fifth, Industrial was servicing one client who had been a Powertrain client during the time of Stephenson’s employment. The parties also stipulated to the amount of any bond to be imposed.
Powertrain’s first witness was Rudy Niswanger (“Rudy”), CEO of Joe Gear Companies (“Joe Gear”). Rudy’s testimony indicated that Powertrain is a subsidiary of Joe Gear, which is owned and operated by the Niswanger family, including Rudy and his father, Joe. According to Rudy, Powertrain is still in business and sells parts for, services, and repairs commercial | .¡vehicles and industrial component parts for such vehicles. However, on cross-examination, he admitted that there is no longer any sign for Powertrain at 1060 Grimmett Drive in Shreveport. The business sign on the building where Powertrain operated while Stephenson was employed there now bears the name Consolidated Truck Parts & Service (“Consolidated”). In fact, on May 1, 2013, Rudy, as vice-president of Joe Gear, mailed a letter to vendors of Powertrain informing them that it would be merging with and become a branch of Consolidated, its “sister company out of Monroe, Louisiana.” The letter noted that operations would continue at the same location, 1060 Grimmett Drive, with no change in office number. The purpose of the letter was to inform vendors of the merger and to establish accounts for Consolidated with the vendors. Even in light of the merger letter to vendors and the absence of any sign for Powertrain at 1060 Grim-mett Drive, Rudy insisted that the merger letter merely referred to something that would happen in the future, but had not yet happened, and that Powertrain was still in business. He claimed that Powertrain shares space with Consolidated and that Powertrain’s business dramatically decreased in the months after Stephenson left. He also testified that the sign on the building says “Consolidated” because that company does more business than Powertrain.
Rudy also testified about Stephenson’s role at Powertrain and described him as the highest-paid person after Joe and a part of upper management. He testified that Stephenson made over $150,000 a year and that he was a valued resource to' Powertrain, involved in every aspect of the ¡4business. Rudy testified about discussing Stephenson assigning his interest in Powertrain back to the company or Joe in February 2013. He believed that Stephenson was given an assignment document and a noncompetition and nonsolicitation agreement to sign at that time.
Raymond Fritz Niswanger (“Fritz”) is an attorney who provides legal services for Powertrain. He drafted the operating agreement at issue. Most of his testimony was proffered and not directly relevant to the operating agreement signed by Stephenson on June 19, 2012. He testified that he reviewed the operating agreement with Stephenson, who indicated that he understood it prior to signing it. Fritz also claimed that Powertrain was still operating.
*1278 Stephenson’s testimony generally confirmed Rudy’s description of his role with Powertrain. Stephenson testified that he was appointed general manager when the former general manager left. He stated that they were trying to “force him to run the entire business” and that he was involved in every aspect of Powertrain. He described himself as the “information hub.” Stephenson admitted that he did become a member of another company, Industrial, after leaving Powertrain. He denied actively soliciting any of Power-train’s customers for his new company, but he did admit that Industrial has done work for at least one business, P-8, that Power-train had serviced while he was employed there. He claimed that any former Pow-ertrain clients now being serviced by Industrial “found” him. With regard to the noncompetition and nonsolicitation agreement, Stephenson denied having direct discussions with anyone at Powertrain about such an | ¡¡agreement, and he claimed he was not aware that Powertrain wanted him to sign such an agreement. Outside the presence of the courtroom on the day of trial, Stephenson signed an act assigning his, 10 percent interest in Powertrain to Joe.
The relevant provisions of the operating agreement are found in Article VII, which addresses “Changes in Members” and has 10 sections. Section 7.1, which is entitled “Transfer of Membership Interest,” states in relevant part:
(a) There shall be no sale, exchange, donation, or other transfer or assignment, for valuable consideration or otherwise (“Transfer ”), other than to Company, of all or any part of a Member’s or Assignee’s Interest in Company without complying with this Article, and any attempted Transfer without complying herewith shall not be recognized by Company.
The remainder of Section 7.1 sets forth an intricate process for the transfer of a membership interest and appears to require the Company or other members to have a right of first refusal before the interest can be transferred to a third party.
Section 7.2, which addresses “Termination of Employment,” states:
For any Member or Assignee, if all of the following apply:
(a) such Member or Assignee is employed by Company as an employee or is otherwise drawing a guaranteed payment for active services to Company; (b) that employment relationship or that guaranteed payment arrangement is terminated for any reason whatsoever (“Termination ”); and (c) the event causing that Termination does not otherwise qualify as a Transfer under Section 7.1 above; then that Termination shall constitute a Transfer under Section 7.1 above, thereby triggering the relevant provisions of Section 7.1 above relating to the responsibility to offer to Transfer an Interest in Company to Company and /or the other Members.
^Section 7.3 is the noncompetition and nonsolicitation provision. It provides, in relevant part, as follows:
As an essential part of any Transfer by any Member or Assignee of all of his Interest in Company, that Member or Assignee (“Prohibited Party ”) shall execute an agreement prohibiting the Prohibited Party from directly or indirectly, owning, managing, operating, controlling, being employed by, consulting with or for, providing financing to, or otherwise participating directly or indirectly in any business which is engaged in selling, servicing, and repairing commercial trucks and similar vehicles and their component parts in the Territory (“Business”). This covenant not to compete with Company shall apply to *1279 competition with the Business in the Louisiana parishes of Caddo and Bossier (“Territory ”). Furthermore, the Prohibited Party shall execute an agreement prohibiting him from directly or indirectly soliciting, for purposes that compete with the Business: (a) any customers of Company in the Territory with whom Company is doing business at the time of the Termination of the Prohibited Party; and (B) any customers of Company in the Territory with whom Company has done business during the term of the Prohibited Party’s employment relationship or similar relationship with Company.
Section 7.3 further provides a term of 24 months for the noncompetition and nonsol-icitation agreement beginning on the day of termination.
Lastly of relevance here is Section 7.10, entitled “Inapplicability” and which states:
Sections 7.1, 7.2, 7.3, and 7.5 above shall not apply to any Transfer to or from, Termination of, or security interest granted by, whether past or prospective, Joe D. Niswanger. Furthermore, all Members hereby waive any defects in any Transfer made prior to the date of this Agreement.
At the close of trial, the trial judge found the operating agreement applicable for purposes of the issuance of a preliminary injunction. The trial judge also made two findings of fact. The trial judge found that Powertrain still exists and is operational, and he found that Stephenson was more than just an employee. Based on these findings, the stipulations of the 17parties, and the operating agreement, the trial judge granted a limited preliminary injunction in favor of Powertrain “prohibiting [Stephenson] from servicing or taking on any services, or provide [sic ] any services” to any clients or customers who are current Powertrain customers. However, the judgment signed by the trial court on November 12, 2013, was more encompassing and prohibited Stephenson from the following “selling, servicing and repairing commercial trucks, similar vehicles and their component parts, or industrial component parts for any clients or customers in Caddo Parish and Bossier Parish” who were previously serviced by and who are currently serviced by Powertrain. The judgment also precluded Stephenson from contacting or soliciting any of Powertrain’s former or current customers.
Following the judgment, Stephenson filed an application for supervisory review, and Powertrain filed a devolutive appeal. By order issued on January 23, 2014, this court granted Stephenson’s writ for perfection as an appeal, noting that the ruling granting the preliminary injunction is a final judgment subject to immediate appeal under La. C.C.P. art. 3612.
In its appeal, Powertrain asserts that the trial court erred in failing to preclude Stephenson from being employed by or affiliated with a competing business. In his appeal, Stephenson asserts that the trial court misinterpreted the operating agreement and therefore erred in granting the preliminary injunction. He also asserts that Powertrain did not show that it continues to engage in business. Finally, he asserts that the trial court’s | sinjunctive relief is broader than the language of the noncompete provision in the operating agreement.
DISCUSSION
As provided by La. C.C.P. art. 3601, an injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases provided by law. Meredith v. Tram Investments, Inc., 48,570 (La.App.2d Cir.12/30/13), 130 So.3d 469. Injunctive relief is an extraordinary remedy that *1280 should only be issued where the moving party is threatened with irreparable loss or injury and is without an adequate remedy at law. Id.; Brannan v. Talbot, 29,692 (La.App.2d Cir.4/2/97), 691 So.2d 848, writ denied, 97-1419 (La.9/19/97), 701 So.2d 172. The party moving for a preliminary injunction must make a prima facie showing that he will prevail on the merits. Meredith, supra. A trial court has broad discretion in ruling on a preliminary injunction and its ruling will not be disturbed absent an abuse of discretion. Id.; Holmes v. Peoples State Bank of Many, 32,749 (La.App.2d Cir.3/3/00), 753 So.2d 1006.
A limited liability company’s operating agreement is contractual in nature. It binds the members of the company as written and is interpreted pursuant to the law of contract. Ark-La-Tex Safety Showers, LLC v. Jorio, 48,478 (La.App.2d Cir.12/18/13), 132 So.3d 986; Risk Management Services, L.L.C. v. Moss, 09-632 (La.App.5th Cir.4/13/10), 40 So.3d 176, writ denied, 2010-1103 (La.9/3/10), 44 So.3d 683. Contracts have the effect of law for the parties, and the interpretation of the contract involves the determination of the parties’ common intent. Ark-La-Tex Safety Showers, 9supra; La. C.C. art. 2045. We must examine the words of the contract in order to determine the reasonable intention of the parties. Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 2012-2055 (La.3/19/13), 112 So.3d 187. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. A clear and unambiguous clause in a contract should not be disregarded so as to pursue its spirit; it is not the court’s duty to “bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties.” Clovelly, 12-2055, p. 6, 112 So.3d at 192. Courts must interpret contracts in a “common-sense fashion,” giving the words of the contract their “common and usual significance.” Id. Each provision must be interpreted in light of the other provisions of the contract so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
The primary issue in this matter is the interpretation of the operating agreement, particularly, whether it requires Stephenson to sign a noncompetition and nonsolicitation provision under the facts of this case. Whether the trial court correctly or incorrectly interpreted a contract, the words of which are clear and unambiguous, is a question of law. Risk Management Services, supra.
Noncompetition agreements have traditionally been disfavored in Louisiana law. Green Clinic, L.L.C. v. Finley, 45,-141 (La.App.2d Cir.1/27/10), 30 So.3d 1094. Every contract, agreement, or provision that restricts one from exercising a lawful profession, business, or trade shall be | mnull and void except as provided in the exceptions set forth in La. R.S. 23:921. Id. However, noncompete agreements are considered in derogation of the common right and must be strictly construed against the party seeking enforcement. Id.; Action Revenue Recovery, L.L.C. v. eBusiness Group, L.L.C., 44,607 (La.App.2d Cir.8/19/09), 17 So.3d 999.
The operating agreement at issue does not contain a noncompetition and nonsolici-tation agreement executed by Stephenson. Instead, Section 7.3 of the operating agreement requires execution of a noncom-petition and nonsolicitation agreement as “an essential part” of a transfer by a member of his interest in Powertrain. This section would seemingly require Stephenson to execute the agreement. However, *1281 prior to the trial, Stephenson had not transferred his interest in Powertrain to any person or entity. At the time of the trial, he executed an act purporting to assign his interest in Powertrain back to Joe. Under the plain and unambiguous language of Section 7.10, the provisions of Sections 7.3 “shall not apply to any Transfer to or from, Termination of, or security interest granted by, whether past or prospective, Joe D. Niswanger.” (Emphasis added.) The clear and unambiguous language of this provision applies to transfers both past and prospective. Thus, Section 7.10 is not written as merely limited to addressing some prior act as asserted by Powertrain. It clearly applies prospectively to future transfers to Joe. Under Section 7.10, by transferring his interest in Powertrain to Joe, Stephenson is not required to comply with Section 7.3.
111 The same result is reached by application of Section 7.1, which provides that there shall be no transfer of a membership interest, “other than to Company,” without complying with Article VII. (Emphasis added.) By transferring his interest back to Joe, Stephenson is in effect transferring it back to the company and does not have to otherwise comply with Article VII, which includes the noncompetition and nonsolicitation section. Had Powertrain sought to bind Stephenson to a noncompet-ition and nonsolicitation agreement, it could have easily done so by having the execution of the operating agreement result in a fully executed noncompete and nonsolicitation agreement. See Green Clinic, supra.
We note that the trial court based its judgment in part on the factual finding that Powertrain is still in operation. Only the self-serving testimony of the Niswangers supports this determination. We recognize that the trial court’s findings based on credibility determinations may not be reversed except for manifest error because “only the fact finder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Foley v. Entergy Louisiana, Inc., 2006-0983, p. 10 (La.11/29/06), 946 So.2d 144, 153; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, manifest error may be found where the witness’s story is contradicted by documents or objective evidence or where the story is internally inconsistent or implausible that a reasonable finder of fact would not give it credit. Foley, supra; Rosell, supra.
| ^Having reviewed this record, we find • manifest error in the trial court’s determination that. Powertrain is still in operation. The May 1, 2013, letter from Rudy to Powertrain vendors entered into evidence as Exhibit D-4 indicated an imminent merger whereby Powertrain would become a branch of Consolidated, “its sister company out of Monroe, Louisiana.” Photographs of the change in sign on the building at 1060 Grimmett Drive from Powertrain to Consolidated support a finding that Consolidated, not Powertrain, is the current operating entity through the merger mentioned in the letter of May 1, 2013. This documentary evidence, particularly in the absence of any documentary or objective evidence of Powertrain’s continued operation, belies the testimony of the Niswangers that Powertrain remains operational apart from Consolidated.
For all these reasons, we find that the trial court abused its discretion in granting the preliminary injunction in this matter. Powertrain did not satisfy its burden of making a prima facie showing that it will prevail on the merits and is not entitled to injunctive relief under the operating agreement so long as Stephenson transfers his interest to Joe and / or the Company *1282 as was sought by Powertrain and as he purported to do at trial.
CONCLUSION
For the reasons stated, the judgment of the trial court granting a preliminary injunction is reversed. To the extent that the trial court denied other injunctive relief requested by Powértrain, its judgment is affirmed. Costs of appeal are assessed against Powertrain.
REVERSED IN PART and AFFIRMED IN PART.

. An operating agreement is a written or oral agreement by members of a limited liability company memorializing its affairs and the conduct of its business. La. R.S. 12:1301(A)(16).