Judgment rendered April 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,534-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

ETC TIGER PIPELINE, LLC                          Plaintiff-Appellee

versus

DT MIDSTREAM, INC. AND DTM                       Defendants-Appellants
LOUISIANA GATHERING LLC

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 83,903

Honorable Nicholas E. Gasper, Judge

* * * * *

STONE PIGMAN WALTHER                    Counsel for Appellants,
WITTMANN LLC                            DT Midstream, Inc.,
By: C. Lawrence Orlansky                and DTM Louisiana
    Nicholas J. Wehlen                  Gathering, LLC
    Faith C. Flugence

COOK, YANCEY, KING
& GALLOWAY, APLC
By: John T. Kalmbach
    W. Drew Burnham
    J. Bert Babington

BRADLEY, MURCHISON,
KELLY & SHEA, LLC
By: Leland G. Horton
   Ashley G. Gable

Counsel for Appellees,
ETC Tiger Pipeline, LLC
and Enable Gas
Transmission

LIZ MURRILL
Louisiana Attorney General

Counsel for Appellee,
State of Louisiana

RYAN M. SEIDEMANN
WARREN B. BATES, JR.
Assistant Attorneys General

OTTINGER HEBERT, LLC
By: Patrick S. Ottinger

Counsel for Appellee,
Louisiana Oil & Gas
Association

PHELPS DUNBAR, LLP
By: H. Alston Johnson, III
   Brad M. Boudreaux
   Kevin W. Welsh

Counsel for Appellee,
Williams Companies, Inc.

CARVER, DARDEN, KORETZKY,
TESSIER, FINN, BLOSSMAN &
AREAUX, LLC
By: M. Taylor Darden
   Brandon T. Darden

Counsel for Appellee,
Louisiana Landowners
Association, Inc.

GORDON, ARATA, MONTGOMERY,
BARNETT, MCCOLLAM, DUPLANTIS
& EAGAN, LLC
By: Scott A. O'Connor
   C. Peck Hayne, Jr.
   J. Douglas Rhorer

Counsel for Appellees,
American Petroleum
Institute and Interstate
Natural Gas Association
of America

＊ ＊ ＊ ＊ ＊

Before COX, THOMPSON, and ELLENDER, JJ.

THOMPSON, J., concurs with written reasons.

**COX, J.**

This appeal arises out of DeSoto Parish, Louisiana. ETC Tiger Pipeline, LLC ("ETC") was granted a temporary restraining order ("TRO") and preliminary injunction to prevent DT Midstream, Inc. and DTM Louisiana Gathering, LLC (collectively, "DTM") from constructing a perpendicular pipeline under ETC's pipeline. DTM appeals the preliminary injunction. For the following reasons, we reverse.

## FACTS

On March 10, 2010, Red River Louisiana I LP ("Red River") granted a Servitude of Use for Pipeline ("ETC Servitude") to ETC.[1] The ETC Servitude was recorded in the public records in DeSoto Parish. ETC's 42-inch, high pressure, high volume natural gas pipeline runs from Panola County, Texas, through the ETC Servitude in DeSoto Parish, to Richland Parish.

In October 2022, ETC was contacted by DTM indicating that it intended to cross the ETC Servitude in DeSoto Parish with a smaller natural gas pipeline. ETC alleged that it had conversations with DTM after the notification. On December 1, 2022, ETC advised DTM that it objected to its route and DTM would need to reroute its pipeline.[2] DTM asked to meet and discuss the pipeline crossing, and ETC maintained that their answer was no. ETC stated that it "invited DTM to involve its commercial team to make

---

[1] Title later transferred from Red River to Republic, Inc.

[2] Originally, DTM's route included crossing property owned by ETC as well as the ETC Servitude. However, ETC informed DTM that it would not be providing a Servitude agreement to cross their property. DTM rerouted in order to avoid the ETC property and intended to cross the ETC Servitude in a different location.

commercially reasonable proposals for the crossing to be considered[.] In the ensuing two months, no such proposals were received[.]"

On March 9, 2023, a contractor for DTM informed ETC that DTM intended to cross the ETC Servitude in a few weeks. ETC again informed DTM that it did not have permission to cross and DTM could not fulfill the necessary safety and operational requirements of ETC. On March 13, 2023, DTM initiated a Louisiana One Call ("One Call") seeking information to cross the ETC Servitude. ETC again informed DTM that it did not have permission to cross. An ETC employee observed pipe on the ground near the ETC Servitude.

ETC filed its petition for TRO, preliminary injunction, and permanent injunction against DTM on March 15, 2023. ETC alleged that it had an exclusive servitude and did not permit any other pipelines to cross. It alleged that the DTM pipeline presents an imminent safety and operational risk for ETC and would cause immediate and irreparable injury, loss, or damage. ETC claimed that DTM's actions expose ETC to immediate and ongoing damages, infringe upon its exclusive servitude rights, and constitute a trespass. ETC requested a TRO to prevent DTM from continuing construction, which it will later request to be permanent, and costs associated with the suit and expert fees.

ETC attached the affidavit of Mark Vedral, who stated he is the senior director of land and right of way with ETC; ETC's exclusive servitude does not allow any other pipelines to cross the ETC Servitude or the same property as the pipeline; and ETC has strict policies for crossing safely, which DTM has not met. Mr. Vedral also stated that ETC invited DTM "to

2

make commercially reasonable proposals for a crossing to be considered by ETC[.]"

ETC attached the affidavit of Joseph Migues, a pipeline technician for ETC. Mr. Migues received the One Call request made by DTM and informed DTM that it could not cross the ETC pipeline as the necessary safety and operational requirements were not and could not be met.

DTM filed an opposition to the preliminary injunction. DTM stated that it made good faith efforts to communicate with ETC regarding compliance with safety codes, construction standards, and industry customs and practices. DTM explained that it is in the process of constructing a 24-inch, 4-mile long pipeline in DeSoto Parish ("DTM Pipeline"). At the location in question, it plans to cross the following four pipelines that run adjacent to and parallel to each other: 1) a 12-inch diameter pipeline owned by The Williams Companies, Inc. ("Williams Co."); 2) a 12-inch diameter pipeline owned by Clearfork Midstream ("Clearfork"); 3) a 42-inch pipeline owned by a different subsidiary of ETC's parent company ("ETC-CP Pipeline"); and 4) ETC's 42-inch diameter pipeline. DTM planned to bore under the four pipelines at a right angle, using a horizontal directional drilling machine. It stated that the DTM Pipeline would run approximately 19 feet below the largest pipeline and 25 feet below the ETC Pipeline, a depth that exceeds ETC's own requirements. DTM stated that it obtained a servitude from the landowner, Red River, and cleared the crossing with Williams Co. and Clearfork.

DTM argued the following: ETC cannot meet their high burden to obtain a preliminary injunction; DTM has a valid servitude agreement to cross the subject property; ETC does not have a property right in the ETC

3

Servitude to prevent crossing; DTM can safely cross the ETC Servitude; DTM gave ETC ample notice; the damage to DTM, its customers, and the public from an injunction outweighs any theoretical harm to ETC; a preliminary injunction would be against public policy and the public interest; and ETC's bond is inadequate.

DTM filed an answer and reconventional demand, denying ETC's portrayal of the events and demanding damages, a TRO, preliminary injunction, and permanent injunction. DTM attached the affidavit of Eric Gray. Mr. Gray stated that he is a senior supervisor of land operations at DTM. He stated that "exclusive" in a pipeline agreement means that no other pipeline can co-locate on a parallel basis within the servitude. He stated that this is common verbiage and does not allow a company to prohibit a crossing.

DTM attached the affidavit of Shane Martin, who outlined the details of the DTM Pipeline and steps that had been taken to work with ETC in boring under the ETC Pipeline. DTM attached the affidavit of Michael Guerra, who stated that DTM will suffer $18.5 million in damages, as well as the potential loss of its anchor shipper, if the project cannot be completed. DTM also attached a copy of their servitude agreement with Red River.

The trial court heard the matter on April 3 through 5, 2023. Mr. Vedral testified that he oversees right of ways and permitting matters, among other things, at ETC's parent company and formerly acquired right of ways for ETC, including the ETC Servitude. He was questioned about the phrase "exclusive servitude of use." Mr. Vedral stated that because of all the Haynesville Shale activity and the fact that they were laying a 42-inch pipe parallel to two other 42-inch pipes, they wanted to have an exclusive

4

servitude that only they could use. He stated that they purchased as many exclusive servitudes as they could for this pipeline. He noted that there was not a depth restriction in the servitude. Mr. Vedral stated that Red River was in the timber business.

When asked how the DTM pipeline would interfere with ETC's future use of the servitude, Mr. Vedral responded:

> They're gonna have a pipeline, that's contained within our sixty-foot exclusive easement, that's gonna be there moving forward. We're gonna have to deal with it, it's going to be there, and there's no way around it. So that impacts our day-to-day operations and maintenance work related to this major, [42-inch], two billion cubic feet per day, natural gas pipeline.

Mr. Vedral detailed the communication he had with DTM representatives and stated the answer was always that DTM could not cross the ETC Servitude or any ETC-owned property. On cross-examination, Mr. Vedral admitted that he does not work on this pipeline on a daily basis and is unaware of how many other pipelines cross the ETC Pipeline and if any others cross in what ETC deems an exclusive servitude area. He admitted that ETC effectively has a wall across North Louisiana in each area they deem to have an exclusive servitude. When asked how deep that wall runs, Mr. Vedral responded, "How deep do you want it to run?" Mr. Vedral later agreed that the wall could go as deep as ETC wanted it to go.

Mr. Vedral emphasized that he believed an exclusive servitude was not limited to only the width of the servitude. He stated that the word exclusive precludes the landowner from granting any other servitude that crosses the ETC Servitude.

Judd Tinkle testified that he is an encroachments project manager for ETC. He detailed ETC's guidelines for a pipeline crossing one of ETC's

5

pipelines. He stated guidelines are the basics for crossing the pipeline, but ETC may require more than is stated in the guidelines. He testified that he did not receive all the necessary paperwork from DTM to approve a crossing and told DTM that the answer to crossing the easement would be no. Emails between Mr. Tinkle and DTM show that initially Mr. Tinkle stated that DTM could cross the ETC Pipeline in a different location (not on ETC-owned property), as long as it adhered to the guidelines, which were copied into the email. Within 15 minutes, Mr. Tinkle sent another email to DTM stating it could not cross the owned property or easements. Mr. Tinkle testified that this change of heart occurred after talking to Mr. Vedral and a joint decision to not allow a crossing. Mr. Tinkle's testimony was, "Like I said before, no crossing of the fee-owned property and the exclusive servitude."

Mr. Migues testified that he is a pipeline technician for ETC. He stated that he received the One Call that DTM had planned activity in the ETC Servitude. He testified that he refers pipeline crossings to ETC's encroachment department. On cross-examination, Mr. Migues stated that in his area of the ETC Pipeline, there have been 60 to 70 pipeline crossings, with the largest pipe being 42 inches in diameter. He stated that in order for another company to know the depth and diameter of the ETC Pipeline, the other company will pothole the pipe, or remove the dirt to visually see the pipeline.[3] He testified that ETC did not allow DTM's contractor to pothole the ETC Pipeline. Mr. Migues stated that without the depth information,

---

[3] Potholing a pipe is a process that combines pressure washing and vacuuming—the ground is saturated with water and the soil is vacuumed up to expose the pipe.

6

DTM could not complete their boring profile for their project. He testified that the reason for not allowing the potholing was above his paygrade.

Mr. Gray testified that he is a senior supervisor of land operations with DTM. He stated the purpose of the DTM Pipeline is to transport natural gas from a facility north of Keatchie to a larger pipe, which will take the natural gas to a hub in South Louisiana. He testified that DTM cannot complete its pipeline profile until all necessary information is received from the pipeline company it is trying to cross. Mr. Gray detailed the following contact that he had with ETC representatives:

- October 2022- first communication with ETC

- November 2022- first written communication with ETC; Emails with Tyler Aldridge, senior land representative with ETC; Informed Mr. Aldridge of the proposed crossing and ETC requested the start date, location, and proposed method, which DTM provided. DTM negotiated with ETC for a servitude through their owned property, but ETC informed DTM that the servitude would not be granted in December 2022.

- December 2022- DTM inquired why they could not get the servitude and if there was another place they could cross the ETC Pipeline; ETC responded that it had future plans for its property and DTM could cross the ETC Pipeline in another location, as long as the design adhered to the exclusive easement guidelines that were attached to the email; ETC requested a copy of DTM's plan and profile; 12 minutes later, ETC sends another email that it will not allow crossing of its property or easements. Mr. Gray called to inquire about the change and was told it was a "commercial" issue

7

and the decision was made higher up to say no to the crossing. Mr. Gray was unable to get further responses from ETC and passed the information to his boss.

Mr. Gray testified that he understood "exclusive" to mean there could not be any other pipeline co-located within the servitude on a parallel basis. He stated that when DTM could not get a servitude agreement with ETC, it sought a servitude through Red River's property and another property, which were granted. Mr. Gray testified that in all of his conversations with ETC, safety concerns or concerns about their contractors were never brought to his attention.

Jeremy Tingler testified that he is the director of land at DTM. He stated that when Mr. Gray told him ETC would not allow them to cross their property and servitude, he reached out to Mr. Vedral. Mr. Tingler was told by Mr. Vedral that "it was out of his hands" and "more of a commercial issue, not a land issue." Mr. Tingler testified that he assumed "commercial" meant they wanted compensation or gas and he was not able to negotiate those issues. He stated that he added Mr. Guerra to the emails because he was on the commercial side of DTM, but Mr. Vedral never gave a name of anyone in ETC's commercial department. Mr. Tingler's opinion was the same as Mr. Gray's—"exclusive" means no parallel pipeline within the 60-foot servitude. Mr. Tingler testified that safety concerns were never expressed to him by ETC. He stated that in his experience, another pipeline company has never attempted to deny a crossing.

Mr. Martin testified that he is a senior supervisor of construction at DTM. He outlined the process for a One Call and how pipeline companies typically coordinate the crossing of pipelines. He stated that after the One

Call in this case, the Williams Co. and Clearfork met them at their sites to pothole the pipelines; the information gathered from potholing was sent to DTM's engineering department to develop a pre-bore profile. He stated that ETC would not meet to allow potholing of their pipelines. Mr. Martin testified that DTM is able to comply with ETC's crossing guidelines and has developed a preliminary bore plan based on the information it has available.

Shannon Perry testified that he is the director of construction for DTM. He stated that he has never encountered a situation where another pipeline company attempted to prevent a pipeline crossing. He testified that he has reviewed ETC's crossing guidelines and DTM is able to comply with those guidelines.

Philip Coleman testified that he is a professional engineer and the director of codes and regulatory at DTM. He testified that the Federal Energy Regulatory Commission ("FERC") is more of an economic regulator that assists companies with permits, tariffs, and rates. He said pipeline safety is regulated by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). Mr. Coleman testified that as it pertains to pipeline safety, there is no difference between a FERC-regulated pipeline (ETC's Pipeline) and a non-FERC-regulated pipeline (DTM's Pipeline). Mr. Coleman detailed the federal regulations regarding separation between pipelines.

Mr. Guerra testified that he is the director of marketing and optimization at DTM, and he has worked on this pipeline project since it began. He stated ETC was a competitor in getting the bid for this pipeline project. He testified that if the project cannot be completed, DTM loses their contract and other gas companies affected by this pipeline would lose

9

contracts and the ability to sell their gas under their current contracts. Mr. Guerra stated he was not put in contact with anyone from the commercial side of ETC until the TRO was filed. He stated that he talked to their VP over commercial and was told they were looking for a business incentive to allow the crossing and mentioned needing help getting some Paloma Natural Gas ("Paloma") gas on their pipeline system. Mr. Guerra testified that ETC never pinpointed exactly what they wanted in exchange for the crossing. He stated that he had never been asked to make a commercial offer in order to cross another pipeline.

Les Smith testified that he is the senior vice president of marketing and midstream for Paloma, which has a contract with DTM to transport its gas to South Louisiana. Mr. Smith detailed the negative economic effects to Paloma if DTM is unable to transport its gas.

Both parties submitted post-hearing briefs. DTM attached proof of its purchase agreement to purchase the land through which the ETC Servitude runs.

On April 17, 2023, the trial court issued its ruling and reasons for ruling. The trial court granted ETC's preliminary injunction and denied DTM's preliminary injunction. It stated that this case falls under La. C.C.P. art. 3663, and ETC only has to show that it has a real right and is seeking to protect its possession of that right. It found that the words of the ETC Servitude were clear—ETC has an exclusive servitude and the crossings anticipated in the servitude do not include a pipeline crossing. The trial court also stated that it believes the safety concerns of ETC are not grounds for issuing a preliminary injunction. It found that the exclusive servitude gave ETC the right to prevent DTM's crossing.

10

DTM filed a motion for clarification, requesting that the injunction in ETC's favor be dissolved immediately upon DTM's recording of its purchase of the property in question. ETC opposed DTM's motion for clarification in a motion to strike the evidence of DTM's purchase agreement. The trial court stated that "the purchase of the land in question would be subject to the current exclusive servitude. This court does not believe that the purchase would change anything." The trial court stated that the motion to strike was moot in light of its ruling on DTM's motion for clarification.

Upon DTM's unopposed motion for modification of ruling, the trial court modified its judgment to avoid any ambiguity as to what work DTM is prevented from performing. DTM applied for supervisory writs to this Court and appealed the trial court's ruling. Their writs were denied as the issue could be decided on appeal.

## ARGUMENTS

DTM argues that the district court erred in interpreting the ETC Servitude as unambiguously granting ETC the right to block construction of a crossing pipeline. It asserts that there is no express grant of that right in the ETC Servitude; contrary servitude provisions reserve broad rights to the grantor, including crossing rights; and Louisiana law requires any doubt to be resolved against ETC.

DTM also argued that ETC failed to make a prima facie case that it is entitled to the relief it seeks and would prevail on the merits; the district court erred in holding that ETC was not required to prove irreparable harm in order to obtain injunctive relief; and the district court erred in denying DTM's motion for clarification of judgment.

11

ETC asserts that the trial court was correct in its interpretation. It argues that DTM has misinterpreted the limits placed on the grantor's rights under the ETC Servitude and has omitted provisions of the ETC Servitude in its analysis. ETC requests that the district court ruling be affirmed.

The following parties filed amicus curiae briefs in support of DTM and allowing the pipeline crossing: The State of Louisiana, Louisiana Oil and Gas Association, Louisiana Landowner's Association, American Petroleum Institute, and The Williams Companies, Inc.[4] There were no filings in support of ETC's position.

## LAW

A trial court has broad discretion in ruling on a preliminary injunction and its ruling will not be disturbed absent an abuse of discretion. *Powertrain of Shreveport, L.L.C. v. Stephenson*, 49,327 (La. App. 2 Cir. 10/1/14), 149 So. 3d 1274.

La. C.C.P. art. 3601 provides, in pertinent part, "An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law[.]" In order to obtain a preliminary injunction a plaintiff must show that he will suffer irreparable harm if the injunction is not granted, that he is entitled to the relief sought, and he must make a prima facie showing that he will prevail on the merits. *Louisiana Granite Yard, Inc. v. LA Granite Countertops, L.L.C.*, 45,482 (La. App. 2 Cir. 8/18/10), 47 So. 3d 573, *writ denied*, 10-2354 (La. 12/10/10), 51 So. 3d 733.

---

[4] Interstate Natural Gas Association of America attempted to file an amicus curiae brief in support of DTM after the filing deadline but was not granted leave of court to file its brief.

12

The personal servitude of right of use confers in favor of a person a specified use of an estate less than full enjoyment. La. C.C. art. 639. A right of use includes the rights contemplated or necessary to enjoyment at the time of its creation as well as rights that may later become necessary, provided that a greater burden is not imposed on the property unless otherwise stipulated in the title. La. C.C. art. 642. A right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude. La. C.C. art. 645.

A predial servitude is a charge on a servient estate for the benefit of a dominant estate. La. C.C. art. 646. The owner of the servient estate may establish thereon additional servitudes, provided they do not affect adversely the rights of the owner of the dominant estate. La. C.C. art. 720. Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate. La. C.C. art. 730.

When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046.

The ETC Servitude contains the following provisions:

Grantor, and under threat of expropriation, does hereby grant and convey to Grantee an exclusive servitude of use sixty feet (60') in width and eighteen thousand three hundred seventy six and one tenth (18,376.10') linear feet, more or less, for the purposes of constructing, maintaining, inspecting, operating, patrolling, repairing, replacing, renewing, and removing, in whole or in part, one (1) pipeline for the transmission of natural gas, its products, byproducts, and derivatives, as may be necessary or convenient for such purposes, upon, under, across, through and along the following described property[.]
…

BUT ONLY as to the location specified for such servitude on the sketch attached hereto as Exhibit A[.]

…

Nothing herein shall be construed as a conveyance of any part of the ownership of the above-described property or the mineral rights underlying the above-described property.

…

[I]n no event shall Grantee, its successors or assigns be permitted to maintain more than one (1) pipeline in this servitude.

…

Grantor may not use any part of the servitude if such use may unreasonably damage, destroy, injure, and/or interfere with the Grantee's use of the servitude for the purposes for which this servitude is being sought by Grantee. Grantor reserves the right to use the servitude for any and all purposes not inconsistent with the purposes set forth in this servitude. Grantor's uses may include but shall not be limited to right to cross the servitude and to construct roads, highways and bridges across it and the right to erect, install and construct over and across the servitude power lines, railroads, tram roads, switch tracks, dams, roads, fences and such other similar facilities which Grantor may desire for the use or convenience of its operations. Such roads, highways, bridges, and other facilities shall be erected, installed, constructed and maintained so as not to deprive Grantee of ingress and egress to the servitude and so as not to interfere unreasonably with the rights granted herein. Such roads, highways, bridges, and other facilities that will cross the servitude must cross the servitude at any angle of not less than forty-five (45) degrees to Grantee's pipelines, provided that all of Grantee's required and applicable spacings, including depth separation limits and other protective requirements are met by Grantor. The use of the servitude by Grantor shall be regulated by all appropriate ordinances, regulations, resolutions or laws of the governmental entity with authority over the servitude. Grantor must notify Grantee in writing before streets, roadways, utilities or other encroachments are installed. Grantee shall exercise its rights of ingress and egress in such a way so as to not unreasonably interfere with the operations of Grantor.

## DISCUSSION

There were discussions in the arguments made by several parties about whether the ETC Servitude is a predial servitude. Based on our Civil Code, the ETC Servitude is not a predial servitude because it does not

14

involve two estates; rather, it is a right of use granted to ETC.  The Civil Code states that a right of use will be governed by usufruct and predial servitude rules, to the extent the rules are compatible.  Our Civil Code anticipates multiple servitudes burdening a servient estate and states that servitudes should be interpreted in favor of the servient estate, which in this case is Red River (and its predecessors in title).

In requesting the TRO and preliminary injunction, ETC asserted that it had an exclusive servitude and could prevent the crossing of DTM's pipeline.  The district court agreed with ETC in its interpretation of the ETC Servitude.  That agreement gives ETC the right to lay one pipeline on the grantor's property within the defined space.  ETC highlighted at district court that the term "exclusive" is used and the grantor's rights are outlined.  According to ETC, the ETC Servitude grants to ETC the use of an unlimited depth and right to prevent another pipeline from crossing under ETC's pipeline.  We do not agree.  We do not find that the one-time use of the word "exclusive" means that ETC's servitude includes all depths and can subjectively block the crossing of another pipeline.

The ETC Servitude is for *one* pipeline within the width described.  It also grants ETC the ability to access and maintain its pipeline.  The depth of the pipeline is not mentioned or described in the body of the ETC Servitude or in the diagrams in Exhibit A.  The word "exclusive" does not convey an intent to specifically retain an exclusive *depth* when the servitude is silent as to depth.  Any uncertainty as to the depth of the pipeline was made certain at

15

the time the pipeline was completed. Once ETC laid its pipeline, its depth became defined.[5]

The purpose of the ETC Servitude is "constructing, maintaining, inspecting, operating, patrolling, repairing, replacing, renewing, and removing" a natural gas pipeline. Therefore, now that the pipeline has been completed, ETC is limited to its operating and maintenance activities associated with this pipeline. Under the one-pipeline provision of the ETC Servitude, ETC cannot lay a second pipeline below this current pipeline. Therefore, the purpose of the servitude supports the finding that the depth is limited to the space used for the current pipeline and does not extend to an infinite depth.

The ETC Servitude states, "[O]ther facilities that will cross the servitude must cross the servitude at any angle of not less than [45] degrees to Grantee's pipelines, provided that all of the Grantee's required and applicable spacings, including depth separation limits and other protective requirements[are met.]" Because the ETC Servitude states depth separation limits must be met, it anticipated the possibility of future underground crossings.

The ETC Servitude did not state that ETC could prohibit underground crossings; they only agreed to prevent any use that "may unreasonably damage, destroy, injure, and/or interfere with" ETC's use of the ETC Servitude. A crossing pipeline that meets applicable spacing, depth separation limits, and other protective requirements is not certain to damage, destroy, injure, or interfere with ETC's pipeline. The trial court found that

---

[5] *See W&T Offshore, L.L.C. v. Texas Brine Corp.*, 18-0950 (La. 6/26/19), 319 So. 3d 822, as corrected (July 18, 2019), 18-00950 (La. 1/29/20), 347 So. 3d 629.

16

safety was not an issue in this case. ETC did not prove that safety was an actual concern and that DTM could not meet ETC's requirements for crossing under their pipeline. The record shows that ETC's concern was how it could gain a "commercial" benefit from the crossing. DTM has shown that it is willing to work with ETC to ensure a proper and safe crossing.

The district court erred in its interpretation of the ETC Servitude and ETC has failed to show that it is entitled to relief and likely to prevail on the merits. Therefore, we reverse the preliminary injunction granted in ETC's favor.[6] Because we are reversing the district court's judgment, we pretermit discussion of the remaining assignments of error.

## CONCLUSION

For the reasons set forth above, the preliminary injunction granted in favor of ETC is reversed. Costs associated with this appeal are cast on ETC.

**REVERSED.**

---

[6] We reverse this case based on the servitude agreement because that is where the district court abused its discretion. However, the public policy and interstate commerce arguments are also compelling reasons to deny such an "exclusive" agreement.

17

**THOMPSON, J., concurs with written reasons.**

I concur with the results of the opinion and write separately to address the notion that through silence and/or ambiguity in an agreement, a landowner should be deprived of the rights of ownership and that the oil and gas industry should effectively be disrupted regarding the ability to construct and maintain necessary pipelines in Louisiana for transmission of oil and natural gas. Appellee suggests this Court should enforce against a landowner an impenetrable iron-curtain of sorts from ground level to the center of the earth, with the sole purpose of allowing the grantee, not the landowner, to monetize the ability for others to cross width, length, and depth of the existing servitude. Such a proposition is confounding when any proposed crossings must be designed, constructed, and operated in a manner so as not to interfere with the operation of the existing pipeline. A careful reading of the agreement between the parties does not support the expansion of the rights of the grantee, diminution of rights of the landowner, or lend any creditability to a theory that would likely be considered violative of the expansive research, writings, and instruction in property law the body of work of the late Professor A.N. Yiannopoulos.

Here, the landowner granted a servitude of use for the construction of one pipeline across its property, and the document actually defines the servitude's purpose:

> …for the purposes of constructing, maintaining, inspecting, operating, patrolling, repairing, replacing, renewing, and removing, in whole or in part, one (1) pipeline for the transportation of natural gas, its products, byproduct, and derivatives, as may be necessary or convenient for such purposes, upon, under, across, through, and along the following described property…

Regarding the scope and extent of the servitude the agreement provides:

1

> BUT ONLY as to the location specified for such servitude on the sketch attached hereto as Exhibit A, and at no other location without the express written consent of Grantor …

"Exhibit A" of the agreement consisted of 12 pages of illustrations and detailed diagrams of the plans for the "60' Wide Permanent R/W & Easement,"[7] which specified exacting coordinates and bearings and provided extensive detail to the inch of depth of location of the pipeline within the servitude.

Appellees would suggest that despite the expressed purpose of the servitude as being for a natural gas pipeline, located within the precise location detailed on the multiple pages of diagrams, that somehow the parties intended that the schematic also included the 60' in width servitude to continue a distance of almost 4,000 miles to the center of the earth. There was no diagram clarifying the servitude continued to the earth's core. Had the parties intended such a result, a thirteenth page, illustrating a cross-section of the planet with the servitude depicted, could easily have been added to the exhibit. If specification of width and location to the inch is important, one would think continuing the servitude thousands of miles toward the earth's core would also have been mentioned, if understood and agreed to by the parties. There is nothing written within the four corners of the agreement to resolve that apparent ambiguity. The parties, likewise, could have expanded the language used in defining the purpose of the servitude paragraph on the first page of the agreement to include: "and to assign to grantee the exclusive right to grant passage across this servitude from the surface of the earth to its core."

---

[7] *Not* the "60' Wide and 4,000 Mile Deep Permanent R/W and Easement."

2

Yet another option to clarify the missing plain meaning of the words and understanding of the parties could be to express the location of the servitude extended to the earth's core at any point in that section of the agreement that detailed the parameters of the servitude. That did not happen, either, in written word or diagram. To assert the grantee was somehow granted exclusive authority *outside* the area necessary for the operation and maintenance of the pipeline produces an absurd result and begs for further judicial interpretation of the validity any similar agreement.

I suggest the language of the servitude created is exactly what it details, *i.e.* the right "**to prevent damage or interference with the efficient maintenance, operation and patrol of the pipeline constructed pursuant to this agreement**" and nothing more. Anything more expansive, especially rights extending thousands of miles, needed to likewise be detailed, and such expansion of the agreement would confirm the clear intent of the parties. I find unpersuasive any argument expanding the servitude to the center of the earth stemming from an agreement that remained silent on that salient consideration. I decline the invitation to further deprive landowners of the rights of ownership or to disrupt the progression of the oil and gas industry by expanding by thousands of vertical miles the dimensions and extent of the servitude based upon the language contained in the agreement. As such, I conclude the trial court was in error and its judgment below should be reversed.