Judgment rendered October 2, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,916-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

ENABLE MIDSTREAM
PARTNERS, LP

Plaintiff-Appellee

versus

LOUISIANA ENERGY
GATEWAY LLC

Defendant-Appellant

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 84,243

Honorable Amy Burford McCartney, Judge

* * * * *

ETHAN P. ARBUCKLE

Counsel for Appellant

PHELPS DUNBAR, LLP
By: H. Alston Johnson, III
    Brad M. Boudreaux
    Kevin W. Welsh
    Stephen R. Vick, Jr.
    Anthony J. Gambino, Jr.
    Jordan P. Zeringue
    Nena M. Eddy

BRADLEY, MURCHISON,
KELLY & SHEA, LLC
By: Kay Cowden Medlin
    Leland G. Horton
    Joshua S. Chevallier
    Ashley G. Gable

Counsel for Appellee,
Enable Midstream
Partners, LP

LIZ MURRILL
Louisiana Attorney General

WARREN B. BATES, JR.
Assistant Attorney General

GORDON, ARATA, MONTGOMERY,
BARNETT, MCCOLLAM, DUPLANTIS
& EAGAN, LLC
By: Clinton P. Hayne, Jr.
    Scott A. O'Conner

CARVER, DARDEN, KORETZHY,
TESSIER, FINN, BLOSSMAN &
AREAUX, LLC
By: Brandon T. Darden

Counsel for Appellee,
State of Louisiana

Counsel for Appellees,
American Petroleum Institute
and Interstate Natural Gas
Association of America

Counsel for Appellee,
Louisiana Landowners
Association, Inc.

* * * * *

Before COX, ROBINSON, and ELLENDER, JJ.

**COX, J.**

This appeal arises out of DeSoto Parish, Louisiana. Louisiana Energy Gateway, LLC ("LEG") appeals a preliminary injunction granted in favor of Enable Midstream Partners, LP ("Enable"). For the following reasons, we reverse the trial court's judgment.

## FACTS

On July 24, 2023, Enable filed a petition for a temporary restraining order, preliminary injunction, and permanent injunction to prevent LEG from interfering "with its property rights and natural gas pipeline operations[.]"

On February 26, 2010, Enable's predecessor, CenterPoint Energy Field Services, entered into a pipeline agreement with Dorothy and James Ricks, which grants an "exclusive fifty foot (50') wide" pipeline easement on property in Section 1, Township 12 North, Range 13 West in DeSoto Parish ("Enable Ricks Servitude"). CenterPoint's successor in title, Enable, operates a gathering pipeline on the Enable Ricks Servitude.

On April 1, 2023, LEG obtained their own servitude over the Ricks property ("LEG Ricks Servitude") intersecting the Enable Ricks Servitude. Enable's affiliate, Energy Transfer, LP ("ETC") was contacted by representatives of Williams Company on behalf of LEG requesting assessment and consent to 42 proposed pipeline crossings on May 23, 2023.[1] Each pipeline crossing involved various sizes of pipe and specifications throughout DeSoto, Caddo, Beauregard, Sabine, and Vernon Parishes. Enable alleged that it was given only 14 days to evaluate the proposed 42

---

[1] LEG is a subsidiary of Williams Company.

crossings and not given all the pertinent information. After numerous email exchanges between the companies, Enable, through an email from Mark Vedral, denied all crossings on June 30, 2023.

In its petition, Enable argued that the Enable Ricks Servitude is an exclusive servitude, and it did not agree to allow any crossing of that servitude. Enable stated that LEG intends to construct a 36-inch natural gas pipeline that would cross the Enable Ricks Servitude. The trial court granted the temporary restraining order.

Mark Vedral, the Senior Director of Land and Right of Way with ETC, stated in his affidavit that Enable/ETC received a request for assessment and consent of more than 40 pipeline crossings. The request was received on May 23, 2023, with a requested response date of June 6, 2023. He stated that complete details and documentation were not provided. Mr. Vedral stated that after receiving inaccurate and incomplete information from LEG, Enable informed LEG that it did not have permission to cross the pipeline. He stated that LEG's contractors were also informed that LEG did not have permission to cross after receiving a Louisiana One Call notice. Mr. Vedral is of the opinion that the Enable Ricks Servitude is exclusive. He alleged "imminent safety and operational risk" and "immediate and irreparable loss."

LEG filed its answer, affirmative defenses, and reconventional demand on September 6, 2023. LEG stated that the documents and written communications are the best evidence of their content. LEG alleged that Enable never identified the missing information and denied that it needed Enable's consent to cross the pipeline. LEG asserted the following affirmative defenses: Enable's petition fails to state a claim upon which

relief can be granted; LEG has complied with all laws to exercise its rights on the property; Enable's rights have not been and will not be adversely affected; LEG has accommodated all of Enable's rights; LEG pleads waiver, release, estoppel, unclean hands, laches, and extinguishment of obligation; LEG asserts all rights under any applicable servitude agreement; Enable does not have a right to a TRO, preliminary, or permanent injunction; and Enable's servitude is an absolute nullity and against public policy.

LEG alleged that Enable has the right to construct one pipeline at a maximum depth of six feet (four feet of cover plus two feet of pipeline diameter), and it has already been installed. LEG stated that it would maintain at least three feet of clearance under Enable's servitude, a depth where Enable has no rights. LEG stated that Mr. Vedral objected to all crossings without explanation. LEG requested a preliminary injunction against Enable's action to block LEG's pipeline, damages, attorney fees, court costs, legal interest, and all other relief which may be equitable under the circumstances.

A hearing on the preliminary injunction was held on September 20, 2023. Steven Futch testified that he is the vice president of interstate engineering for ETC; Enable is a pipeline company owned by ETC; and he is responsible for all project development and project execution for all company pipelines. He stated that he has never received 42 proposed pipeline crossings at once. When reviewing the request, Mr. Futch believed that 42 crossings meant LEG would switch back and forth over the Enable Pipeline and end up back on the same side. He stated the two-week turnaround was not a normal request. Mr. Futch detailed ways in which a pipeline crossing could pose obstacles in the future: the pipeline never leaves

because a hole or dirt settling would remain; maintenance is more difficult; the inability to move the pipeline if there is a change in the surface usage; and repeated need to coordinate between the pipeline companies. Mr. Futch clarified that the Enable Ricks Servitude does not have a maximum depth limitation, only a minimum depth of three or four feet depending on the surface use.

On cross-examination, Mr. Futch disagreed with opposing counsel regarding whether the LEG pipeline is a gathering pipeline and the applicable federal laws. Counsel for LEG asked Mr. Futch to clarify that the 42 crossings were planned to cross not only pipelines owned by Enable but also different pipelines. Mr. Futch stated that the crossings were of "all of our assets," which includes companies within the ETC/Enable family of companies. Mr. Futch agreed that safe pipeline crossings happen "all the time." On both direct and cross, Mr. Futch mentioned that the ETC/Enable family of companies is the largest pipeline owner/operator in the country with 120,000 miles of pipe.

Judd Tinkle, an encroachments project manager for ETC, testified that he works on crossing requests. He stated that once the encroachments division has approved the crossing, the right-of-way groups will then review the request. Mr. Tinkle received the pipeline crossing requests from LEG. He stated that it is unusual to get 42 requests at once. He testified that he did not receive all the crossing diagrams together. Mr. Tinkle stated that it typically takes three to four weeks to go through an encroachment request, so he did not expect to have all the requests completed by the June 6, 2023, deadline given by LEG. He stated that he requested missing information

4

from LEG, including a full KMZ file because he received partial files.[2] Mr. Tinkle testified LEG's construction method was not clear in its crossing requests. He testified that Enable received Louisiana One Call notifications from LEG after the TRO was signed. He stated that it would not be sufficient for LEG to simply follow ETC's crossing guidelines and proceed with construction.

On cross-examination, Mr. Tinkle admitted that some of the items he stated were missing (i.e. proof of insurance and an encroachment agreement) are not actually listed on the list of required documents for encroachment approval. He also admitted that providing a full KMZ file is not in the guidelines, but it is something ETC asks to be provided. He stated that ETC's guidelines do provide that it needs a final submittal plan and profile drawings. Mr. Tinkle stated that the full KMZ would not be necessary to access the Ricks Property, and from an encroachment standpoint, LEG has proposed a safe crossing of the Enable Ricks Servitude.

Tyler Aldridge, a senior right-of-way representative at ETC, testified that he manages groups of field agents that acquire and manage land rights for pipeline assets. He stated that he has been involved in making requests on behalf of ETC to cross Williams Company. He testified that exclusive agreements allow ETC "to safely and effectively operate and maintain our pipeline and its assets within that easement without having to worry about the interference of a third party." Mr. Aldridge stated that when acquiring servitudes, ETC always tries to get an exclusive servitude. His testimony corroborated Mr. Futch's testimony that if LEG crossed Enable's servitude,

_____

[2] The KMZ file contains workspace, pipelines, easements, and map information that Enable could compare with their internal GIS system.

5

Enable would have to coordinate any maintenance of the Enable Ricks Servitude with LEG, potentially costing more money and taking more time.

On cross-examination, Mr. Aldridge stated that he interpreted the three- and four-foot depth requirements to be minimum depths based on industry practice. He testified that Enable's position is that it does not plan to allow the crossing under the Enable Ricks Servitude. He stated that no amount of data or information could be provided to change that position. Mr. Aldridge was asked to read through emails he sent to a subsidiary of Williams Company when ETC requested to cross an exclusive servitude. He stated that in that request, he only sent a pinpoint KMZ file, not the entire pipeline's KMZ file. Mr. Aldridge testified that after Enable was notified that there were 42 crossings, Mr. Vedral, from the land department, asked that all the crossings be submitted at one time.

Mr. Vedral testified that he is the director of land and right-of-way for ETC. He stated that the exclusive servitude gives Enable the "rights to defend that fifty-foot easement with third-party obstructions and to have a say." He agreed with Mr. Aldridge that the three- and four-foot depth restrictions were minimums, not maximums. Regarding whether he was aware before the crossing requests that LEG was planning to cross 42 times, Mr. Vedral stated:

> [S]he had mentioned earlier in the year--I'll say somewhere around Spring of this year--that there was some crossings coming up in Louisiana. And I think at that time, she had mentioned maybe around twenty. Again, this was just hearsay essentially--us talking. So I was not aware of it being forty-two, but she had disclosed or presented that there was a larger size project coming down the road in the future.

Mr. Vedral testified that he asked LEG representatives to provide all the crossing requests at once. Mr. Vedral stated that he wanted to see the full picture of LEG's project—the full pipeline route, whether they had expropriation rights, servitude agreements for the pipeline, and any certificates received by the State of Louisiana. He testified that after receiving the LEG proposed crossings, ETC received a crossing request from another company with over 100 planned crossings.

In clarifying his desire to know about expropriation rights, Mr. Vedral stated:

> I have stated all along if a company has the rights of expropriation, whether at any particular state they're in, via the utility of that state, or it's under a FERC certificate, from my perspective I review the land rights differently. Say we have an exclusive easement, but it's Williams' Transco system, which is a FERC-regulated system and they're putting an expansion onto it and they need to get across our exclusive easement, if we've got a problem with it or if we try to hang it up, I need to know if they would have to file for expropriation. They could probably go to federal court and get an injunction, or if they wanted to expropriate they could. They have that right with that certificate. So in the case of is it an expropriation level pipeline versus a gathering line, well a gathering line does not have those rights of eminent domain or expropriation. So us having an exclusive easement sitting there with a superior right, a superior land right, holds more water in my opinion. We have a right that is existing and is there. You don't have the right to expropriate us. That's why we're standing firm.

On cross-examination, Mr. Vedral was asked about the other lawsuits ETC has filed to prevent crossings. Mr. Vedral stated that some of the other lawsuits do not involve agreements with the word "exclusive," but the goal is to block all the crossings in this LEG project. Mr. Vedral was asked to review two Letters of No Objection from ETC to third-party companies from 2021 and 2022 that included requirements for crossing under an exclusive agreement. Mr. Vedral stated that he was not on the review team for the

2021 crossing and did not know why the crossing of an exclusive servitude was allowed. Mr. Vedral stated the 2022 crossing may have been allowed because it was going to connect to the ETC pipeline. When asked if one of the criteria for allowing a crossing was whether it would be good for business, Mr. Vedral responded, "I'd say yes. I mean we're a growing company. We're always looking to negotiate deals and grow our bottom line. So anytime that we can, uh, conduct business to make money, that's what we do."

Mr. Vedral was questioned about his affidavit that mentioned general safety risks of LEG crossing Enable. He stated he is in the land department and not part of encroachments or engineering. He stated that his knowledge of safety concerns comes from years in the industry and any crossing could present an imminent safety risk.

Eric Malstrom testified on behalf of LEG. Mr. Malstrom is a licensed engineer and project director for Williams Company. He stated Williams Company is working on the LEG project and explained the purpose of the LEG pipeline to alleviate bottlenecks in the gathering systems that make moving gas from the well sites difficult. Mr. Malstrom described an exhibit that showed the placement of the pipelines in the area. Mr. Malstrom testified that there is typically collaboration between pipelines and crossings are expected, but that has not been the case with this LEG project. He stated that there has been no collaboration, and ETC has had broad objections from the beginning without the willingness to work out any concerns. He testified that all the crossings will follow industry safety standards, as well as ETC's own standards for crossing exclusive and non-exclusive servitudes.

Mr. Malstrom described the impact of blocking pipeline crossings on the landowners and mineral owners. He stated the landowner would have fewer options to get their gas to market, it creates an anticompetitive environment, and it could potentially result in less income for the land and/or mineral owners. Mr. Malstrom clarified that the planned crossings are not a zigzag back and forth over a straight ETC/Enable pipeline but crossing a spiderweb of pipelines owned by ETC/Enable. He explained that LEG has considered a reroute around the Enable Ricks Servitude; however it will add 2,750 feet of pipe, cost about $1.8 million, and still require them to cross ETC further down the line. He stated that even if they found a place to cross ETC without the word "exclusive" in the servitude, ETC is currently litigating all crossings; therefore, they would still likely find themselves in litigation to cross. Mr. Malstrom testified that Williams Company and LEG are aware of ETC's attempts to block other exclusive servitudes and wanted to get these exclusive servitudes litigated at the beginning of the project. Regarding ETC's request for the full KMZ file, Mr. Malstrom stated that the file has commercially sensitive information in it. He then stated:

> I don't understand why [ETC] would need information on one hundred percent of our pipeline, 99.8% of it which isn't even on any of their servitudes, to understand their rights associated with .2% of our entire length. I don't know why you would need information for a pipeline that's thirty miles away [from] your servitude that's only fifty feet wide.

Wendy Whitfill-Embry testified that she is a land manager for Williams Company overseeing land acquisitions. She stated that her job position requires her to work in 19 states, and this is the first time she has experienced a pipeline company attempting to block an encroachment. She testified that she never received any communication from ETC that specific

9

information was missing or inaccurate regarding the Enable Ricks Servitude crossing.

Mrs. Whitfill-Embry stated that pipeline crossings with ETC were historically amicable, but in the past year, ETC changed its position on crossing exclusive pipelines. She stated that now Mr. Vedral mentions getting their commercial departments involved, which never happened in the past. She speculated that part of the relationship breakdown between ETC and Williams Company could have stemmed from a $600 million judgment Williams Company obtained against ETC due to a failed merger at the end of 2021/beginning of 2022. Mrs. Whitfill-Embry stated that exclusive language in a servitude agreement is intended to prevent co-location or parallel pipelines within the servitude, not prevent perpendicular crossings.

On cross-examination, Mrs. Whitfill-Embry stated that she received the request for the full KMZ file, but LEG's position is that the full file will not be provided for the entire project.

Lee West testified that he has worked for Williams Company for nine years as a construction manager in the gathering processing group and has been in the pipeline industry for 19 years. He stated that he has been involved in numerous pipeline crossings, including crossing ETC pipelines, and there have been no safety concerns. Mr. West testified that Williams Company selected a reputable contractor that ETC previously used to perform the necessary potholing of the Enable Ricks Servitude but was denied access by ETC. He stated that final construction details and concerns have been handled at the field level in past projects. He stated that he has reviewed ETC's crossing guidelines, and the LEG project complies with

10

those guidelines.  Mr. West detailed Williams Company's plans for construction on this ETC crossing.

At the close of testimony, the trial court requested briefing.  Both sides filed their briefs, and the trial court issued its judgment.  The trial court granted the preliminary injunction as requested by Enable on December 18, 2023.

In written reasons for ruling, the trial court found that Enable has a real right in the property and is not required to show irreparable harm to obtain the preliminary injunction.  The trial court stated that the Enable Ricks Servitude provides that Enable would have the right to prevent future construction within the boundaries of the servitude.  The trial court found both servitudes to be clear and explicit and do not lead to absurd consequences by the terms of the servitude agreement.  LEG's incomplete data submission and the "extraordinarily narrow window of time" LEG requested review and approval of 42 crossings was found by the trial court to be pertinent to this case.

Regarding the claims by LEG that Enable acted in bad faith and in a combative manner, the trial court found relevant that LEG requested approval of 42 crossings in nine business days.  The trial court stated: Despite the enormous financial investment and the considerable time devoted to securing servitude agreements for nearly 200 miles of pipeline, LEG chose an untenable approach to obtaining pipeline crossings necessary for the successful completion of the LEG project.  Enable did not act unreasonably by conveying a general objection to all pipeline crossings as LEG did not afford Enable adequate time to evaluate the proposal.

LEG now appeals.

11

## DISCUSSION

LEG argues that Enable's "exclusive" servitude does not allow it to forbid subsequent crossings. It asserts that only ownership can confer exclusive authority, and a personal servitude conveys less than full enjoyment. LEG states that this case is almost identical to *ETC Tiger Pipeline, LLC v. DT Midstream, Inc.*, 55,534 (La. App. 2 Cir. 4/10/24), 384 So. 3d 458 because of the one-time use of the word "exclusive" in the agreement; Enable's one pipeline authorized by the agreement has already been completed; and there are no safety concerns for the crossing.

LEG highlights that just because Enable can review and consent to the third-party construction under Paragraph 9, it does not have authority to prevent any crossings below the Enable servitude, as found in Paragraph 12(3) of the agreement. LEG asserts that public policy prevents a broad reading of Paragraph 9. It argues that the civil code disfavors the trial court's interpretation of the servitude under La. C.C. arts. 720 and 730.

Enable argues that the trial court properly considered the Enable Ricks Servitude agreement in determining the servitude is exclusive and Enable has the authority to block LEG's pipeline. Enable highlights the provisions preventing excavation and removal of the ground above and around its pipeline. Enable asserts that the servitude agreement is the best evidence of the intent of the parties. It argues that the trial court was correct in holding that the Enable Ricks Servitude is clear and explicit, and a plain reading does not lead to absurd consequences. Enable argues that LEG seeks to infringe upon Enable's real property rights without compensation or

12

expropriation, and allowing otherwise would be a takings violation of the Louisiana Constitution.

Amicus briefs were filed by Interstate Natural Gas Association of America, American Petroleum Institute, Louisiana Landowner's Association, Inc., and the State of Louisiana, all of which support LEG's position that the trial court judgment should be reversed.

LEG argues that Enable failed to meet its burden of proof that LEG's crossing will irreparably harm Enable and adversely affect Enable's use of its servitude. It states that the trial court erred when determining that Enable did not have to show irreparable harm because it sought to enjoin LEG from interfering with its real right.

Enable argues that it was not required to prove irreparable harm or adverse effects because it has a real property right, but the trial court found that Enable proved irreparable harm. It states that the trial court found that potholing was invasive and had the potential to harm its pipeline.

## LAW

A trial court has broad discretion in ruling on a preliminary injunction and its ruling will not be disturbed absent an abuse of discretion. *ETC v. DT Midstream, supra*; *Powertrain of Shreveport, L.L.C. v. Stephenson*, 49,327 (La. App. 2 Cir. 10/1/14), 149 So. 3d 1274.

La. C.C.P. art. 3601 provides, in pertinent part, "An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law[.]" In order to obtain a preliminary injunction, a plaintiff must show that he will suffer irreparable harm if the injunction is not granted, that he is entitled to the relief sought, and he must make a prima facie showing that he will

13

prevail on the merits. *ETC v. DT Midstream, supra*; *Louisiana Granite Yard, Inc. v. LA Granite Countertops, L.L.C.*, 45,482 (La. App. 2 Cir. 8/18/10), 47 So. 3d 573, *writ denied*, 10-2354 (La. 12/10/10), 51 So. 3d 733.

Injunctive relief to protect or restore possession of immovable property or of a real right therein is available to "a person who is disturbed in the possession which he and his ancestors in title have had for more than a year of immovable property or of a real right therein of which he claims the ownership, the possession, or the enjoyment." La. C.C.P. art. 3663(2). A preliminary injunction brought pursuant to La. C.C.P. art. 3663 does not require a showing of irreparable harm. *Whitlock v. Fifth Louisiana Dist. Levee Bd.*, 49,667 (La. App. 2 Cir. 4/15/15), 164 So. 3d 310.

The personal servitude of right of use confers in favor of a person a specified use of an estate less than full enjoyment. La. C.C. art. 639. A right of use includes the rights contemplated or necessary to enjoyment at the time of its creation as well as rights that may later become necessary, provided that a greater burden is not imposed on the property unless otherwise stipulated in the title. La. C.C. art. 642. A right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude. La. C.C. art. 645.

A predial servitude is a charge on a servient estate for the benefit of a dominant estate. La. C.C. art. 646. The owner of the servient estate may establish thereon additional servitudes, provided they do not affect adversely the rights of the owner of the dominant estate. La. C.C. art. 720. Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate. La. C.C. art. 730.

14

When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.  La. C.C. art. 2046.

The Enable Ricks Servitude contains, in pertinent part, the following provisions:

1. Easement.  A permanent and exclusive right of use, servitude, easement and right-of-way Fifty feet (50') in width (hereinafter called the "Easement"), being Twenty-five feet (25') on either side of the midline, together with all improvements located thereon, on, in, over, under, through and across Grantor's land for the purpose of locating, establishing, constructing, laying, installing, operating, using, maintaining, inspecting, testing, protecting, cathodically protecting, repairing, assigning, restoring, renewing, reconstructing, replacing, substituting, changing, altering, converting, relocating within the Easement and removing therefrom one (1) pipeline not to exceed Twenty-four (24") inches nominal diameter, together with such appliances, equipment and appurtenant facilities (above and below ground) as from time to time deemed by Grantee to be necessary, useful or convenient in connection with the use and convenient operation of the pipeline, for the transportation of oil, gas, petroleum products, fresh water, saltwater, or any other liquids, gases (including inert gases) or substances which can be transported through pipeline…The description of the Easement and the Easement location, are described in Exhibit "A" attached hereto and made a part hereof for all purposes.

7. Pipeline Depth.  Except as provided for in paragraph 12 (3), the pipeline will be buried to a minimum depth of thirty-six inches (36") below the surface of the ground[.]

9. Restrictions on Grantor Use of Easement.  Except as provided for in paragraph 12 (11), without prior, written consent of the Grantee, Grantor shall not construct or permit construction within the boundaries of the Easement, and Grantee shall have the right to prevent the construction within the boundaries of the Easement and the right to remove therefrom, any and all types and sizes of houses, barns, buildings, structures, permanent impoundments of water, and natural or man-made obstructions, including but not limited to trees, brush, roots and other growth. Grantor shall not, nor permit third parties to, change the grade of the land or remove the cover over the pipeline or excavate on or near the Easement without prior, written consent of the Grantee.

15

12. <u>Special provisions.</u>

(3) <u>DEPTH OF PIPELINE</u>: The pipeline constructed under the terms of this agreement shall be buried to a depth of four (4) feet below normal ground level in pastureland areas and three (3) feet below ground level in timberland areas.

## DISCUSSION

As we stated in *ETC v. DT Midstream*, the pipeline servitude is not a predial servitude because it does not involve two estates; rather, it is a right of use granted to the pipeline company. *See also* La. C.C. art. 645, comment (b). Enable has a right of use in a 50-foot-wide strip across the Ricks Property. According to La C.C. art. 639, a right of use is for a specific purpose and less than full enjoyment. Here, the purpose of the ETC Ricks Servitude was the placement and maintenance of one pipeline.

Enable argues this case is distinguishable from the *ETC v. DT Midstream* case because the clauses are different and there were 42 requests submitted at once. First, we find that the trial court improperly considered the number of crossings requested in reviewing the injunction for this one crossing. Mr. Vedral anticipated multiple crossing requests and told LEG to submit all its requests at once. If Enable was overwhelmed or needed more time, it was the result of its own decision to ask that all requests be submitted together.

As in *ETC v. DT Midstream*, whether Enable has the right to block the crossing pipeline is dependent upon the Enable Ricks Servitude agreement and what was granted to Enable. The Enable Ricks Servitude uses the word "exclusive" once, and it is not defined in the agreement. In keeping with this Court's jurisprudence, we do not find that the one-time use of the word

"exclusive" means that Enable's servitude includes all depths and can subjectively block the crossing of another pipeline.

The Enable Ricks Servitude is for one pipeline within the 50-foot servitude, buried at a depth of three to four feet, depending upon the surface use. Paragraph 7 has a general depth provision of at least three feet. However, that is subject to the specific provisions in paragraph 12(3), which states the pipeline "shall be buried to a depth of four (4) feet below normal ground level in pastureland areas and three (3) feet below ground level in timberland areas." Unlike the *ETC v. DT Midstream* case, this agreement states a depth for the pipeline. Therefore, we will not stretch the one-time-use of the word "exclusive" to convey an intent of exclusive rights to all depths when the pipeline must be buried at a specific depth.

The purpose of the Enable Ricks Servitude is "locating, establishing, constructing, laying, installing, operating, using, maintaining, inspecting, testing, protecting, cathodically protecting, repairing, assigning, restoring, renewing, reconstructing, replacing, substituting, changing, altering, converting, relocating within the Easement and removing therefrom one (1) pipeline." Enable cannot lay a second pipeline under this agreement and is limited to maintaining the current pipeline. Even if the maintenance of the pipeline requires it to be replaced, the agreement's terms as to placement and depth remain the same. Therefore, the purpose of the pipeline does not support a finding of "exclusive" to mean an infinite depth.

The Enable Ricks Servitude states that the landowner may not permit "construction within the boundaries of the Easement, and Grantee shall have the right to prevent the construction within the boundaries of the Easement." Because we do not find the word "exclusive" to convey the

17

meaning of infinite depths, we do not find that the installation of a second pipeline below the Enable pipeline is within the boundaries of the easement.

The prohibition on construction lists multiple above-ground activities as examples. The only underground activities in the prohibition of construction are the changing of the grade, removal of dirt cover, or excavation. This contemplates activities that would change the depth of the pipeline, i.e. leveling the land which would make the pipeline shallower than the initially buried depth. The prohibition against excavation is that which is "near" the easement. What constitutes "near" is ambiguous. Is ten feet "near" or is it only two feet? What is considered "near" will likely be subjectively based on safety concerns and the planned excavation project. Here, Enable did not block LEG based on articulable safety issues. Mr. Futch testified that safe pipeline crossings occur frequently. Mr. Tinkle stated that from an encroachment standpoint, the proposed crossing would be safe. There was some discussion on changes regarding cathodic testing if a pipeline were to cross the Enable Ricks Servitude, but it was not an issue of safety or irreparable harm.

As in the *ETC v. DT Midstream* case, the concern is not safety but Enable attempting to block a competitor or gain a "commercial" benefit. The district court erred in its interpretation of the Enable Ricks Servitude, and Enable has failed to show it is entitled to relief. Enable does not have a property right to infinite depths, which are outside the easement boundaries and did not show irreparable harm. Therefore, we reverse the preliminary injunction granted in favor of Enable.

## CONCLUSION

For the reasons set forth above, the preliminary injunction granted in favor of Enable is reversed. Costs associated with this appeal are cast on Enable.

**REVERSED.**